ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT LEXINGTON
CIVIL ACTION NO. 5:06-CV-00299-JBC

JUSTIN CRAWFORD, BOBBI BARTLETT, BRIAN HERBEL, JESSICA HERBEL,
REBECCA GRILLO, KEVIN JOHNSON, CLAUD A. REYNOLDS
DEBORAH LENNON and JANET VANNATTA,
on behalf of themselves and all other persons
currently and formerly employed as Officers by the
Lexington-Fayette Urban County Government,
Division of Community Corrections

and

FRANK ADAMS, JESSICA ALBRIGHT, ARTHUR L. ALLEN, APRIL ANTHONY,
RONALD M. BALL, SARAH BALLTRIP, RALPH C. BALLTRIP II, BRIAN BLAIR,
DONALD BOWLES, JOHNNIE BROWN, EMBER BURDETTE, GEORGE BURDETTE,
DESTINEY CLARK, KEITH COMPTON, VICTOR COTTON, ADELA DELEON,
JONATHAN DUTY, BENJAMIN C. FIELDER, TRACY FLEXTER-BRIMEYER, ELAINNA
GILL, NEAL GILL, GENE GREGORY, SHAWNA HITCH, GREGORY L. HORN, ROBERT
E. HOWARD, JR., CARROLL C. HUGHES, JR.,TIMOTHY KENT, YOLANDA G. LEACH,
DENNIS MCHATTON, ROGER MEADOWS, JUSTIN PIERCY, ROBIN REID, JAY R. RICE,
CHRISTINA R. RICHMOND, KENNETH D.ROBINSON, JR., RACHEL SANTIAGO,
STEPHANIE SHELBY, HOWARD SLAUGHTER, DAN H. SMITH, NATHAN STEWARD,
KAREN STORMBRINGER, CHRIS TAYLOR, CHAD THORNBERRY, DONALD TIBBITS,
JOLYNN TRENT, CHARLOTTE TROTTER, BRIAN VOLL, RICARDO M. WASHINGTON,
JONATHAN WEBSTER, AUTUMN L. WENNER, ALISHA B. WHITE, ANTHONY
JOHNSON, and JOHN MCNAMARA

PLAINTIFFS

v._____          **FIRST AMENDED CLASS ACTION**
                                   **AND COLLECTIVE ACTION COMPLAINT**

LEXINGTON-FAYETTE URBAN
COUNTY GOVERNMENT                                          DEFENDANT

* * * * * * * * * * * * * * *

Come the Representative Plaintiffs, Justin Crawford, Bobbi Bartlett, Brian Herbel, Jessica Herbel, Claud A. Reynolds, Rebecca Grillo, Kevin Johnson, Deborah Lennon and Janet Vannatta, individually and on behalf of all other persons currently and formerly employed as Officers by the Lexington-Fayette Urban County Government ("LFUCG"), Division of Community Corrections ("DCC"), and the Plaintiffs Frank Adams, Jessica Albright, Arthur L. Allen, April Anthony, Ronald M. Ball, Sarah Balltrip, Ralph C. Balltrip II, Brian Blair, Donald Bowles, Johnnie Brown, Ember Burdette, George Burdette, Destiney Clark, Keith Compton, Victor Cotton, Adela Deleon, Jonathan Duty, Benjamin C. Fielder, Tracy Flexter-Brimeyer, Elainna Gill, Neal Gill, Gene Gregory, Shawna Hitch, Gregory L. Horn, Robert E. Howard, Jr., Carroll C. Hughes, Jr.,Timothy Kent, Yolanda G. Leach, Dennis McHatton, Roger Meadows, Justin Piercy, Robin Reid, Jay R. Rice, Christina R. Richmond, Kenneth D.robinson, Jr., Rachel Santiago, Stephanie Shelby, Howard Slaughter, Dan H. Smith, Nathan Steward, Karen Stormbringer, Chris Taylor, Chad Thornberry, Donald Tibbits, Jolynn Trent, Charlotte Trotter, Brian Voll, Ricardo M. Washington, Jonathan Webster, Autumn L. Wenner, Alisha B. White, Anthony Johnson, and John McNamara, by counsel, for their First Amended Complaint, and state as follows:

## INTRODUCTION

1.     The Plaintiffs, and other Officers currently and formerly employed by the LFUCG DCC (collectively described herein as "DCC Employees"), are responsible for supervising and guarding inmates in the custody and control of the LFUCG DCC.

2.     The DCC has approximately 1100 inmates in its custody and control.  Some of those inmates have been charged with or convicted of violent and dangerous crimes.  DCC Employees are

responsible for protecting these inmates from themselves and each other, and for protecting the public from any threat of escape by any inmate.

3.      DCC Employees thus perform highly stressful and critical work for the safety and benefit of the Lexington and Fayette County community.

4.      As set forth more particularly below, the DCC has engaged in long-standing, widespread, and multiple violations of the Fair Labor Standards Act ("the FLSA"), 29 U.S.C. § 201, et seq., and of the Kentucky Wage and Hours Act ("the Kentucky Act"), KRS Chapter 337.  Through the DCC, the LFUCG has deprived the Plaintiffs and members of the proposed Class of compensation for the full amount of time worked, overtime compensation, adequate Meal Periods and Rest Periods, of proper Compensatory Time, and of proper pension contributions. The allegations set forth below constitute common abusive employment practices, applicable to all current and former DCC Employees, which violate both federal and state law.

THE PARTIES

5.      The LFUCG is an Urban County Government established pursuant to the provisions of KRS Chapter 67A.  The Chief Executive of the LFUCG is Teresa Isaac, Mayor.  The address for service of process on Mayor Teresa Isaac is 200 East Main Street, Lexington, Kentucky 40507.

6.      The LFUCG is engaged in activities which constitute and/or affect interstate commerce.

7.      The Representative Plaintiffs bring this action in their individual capacities and on behalf of a class consisting of all other persons currently and formerly employed as Officers by the LFUCG DCC.

8.      Representative Plaintiff Bobbi Bartlett is a resident of Fayette County, Kentucky, and was employed by the DCC from January 3, 2000 to September 1, 2006. Bartlett was employed as a Corporal in the DCC's Master Control Bureau, Second Shift, until September 1, 2006.

9.      Representative Plaintiff Justin Crawford is a resident of Garrard County, Kentucky, and has been employed by the DCC since August 5, 1996. Crawford is currently employed as a Sergeant in the DCC's Custody Bureau. Crawford was previously a Lieutenant, but was granted a request to be demoted to a Sergeant, Second Shift.

10.     Representative Plaintiff Brian Herbel is a resident of Jackson County, Kentucky, and became employed by the DCC in February 2002. Herbel is currently employed as a Corporal in the DCC's Intake Bureau, Second Shift.

11.     Representative Plaintiff Jessica Herbel is a resident of Jackson County, Kentucky, and became employed by the DCC in or about 2003. Herbel is currently employed as a Corporal in the DCC's Intake Bureau, First Shift.

12.     Representative Plaintiff Rebecca Grillo is a resident of Fayette County, Kentucky, and has been employed by the DCC since March 6, 1989. Grillo is currently employed as a Lieutenant in the DCC's Custody Bureau, First Shift.

13.     Representative Plaintiff Kevin Johnson is a resident of Fayette County, Kentucky, and has been employed by the DCC since July 26, 1994. Johnson is currently employed as a Sergeant in the DCC's Custody Bureau. Johnson was previously a Lieutenant, but was granted a request to be demoted to a Sergeant, Second Shift.

14.     Representative Plaintiff Deborah Lennon is a resident of Clark County, Kentucky, and has been employed by the DCC since November 2002. Lennon is currently employed as a Corporal in the DCC's Custody Bureau, Third Shift.

15.     Representative Plaintiff Claud A. Reynolds is a resident of Franklin County, Kentucky, and has been employed by the DCC since September 2000.  Reynolds is currently employed as a Corporal in the DCC's Intake Bureau, Second Shift.

16.     Representative Plaintiff Janet Vannatta is a resident of Fayette County, Kentucky, and has been employed by the DCC since January 2004.  Vannatta is currently employed as a Corporal in the DCC's Custody Bureau, Third Shift.

17.     Plaintiffs Frank Adams, Jessica Albright, Arthur L. Allen, April Anthony, Ronald M. Ball, Sarah Balltrip, Ralph C. Balltrip II, Brian Blair, Donald Bowles, Johnnie Brown, Ember Burdette, George Burdette, Destiney Clark, Keith Compton, Victor Cotton, Adela Deleon, Jonathan Duty, Benjamin C. Fielder, Tracy Flexter-Brimeyer, Elainna Gill, Neal Gill, Gene Gregory, Shawna Hitch, Gregory L. Horn, Robert E. Howard, Jr., Carroll C. Hughes, Jr.,Timothy Kent, Yolanda G. Leach, Dennis McHatton, Roger Meadows, Justin Piercy, Robin Reid, Jay R. Rice, Christina R. Richmond, Kenneth D.robinson, Jr., Rachel Santiago, Stephanie Shelby, Howard Slaughter, Dan H. Smith, Nathan Steward, Karen Stormbringer, Chris Taylor, Chad Thornberry, Donald Tibbits, Jolynn Trent, Charlotte Trotter, Brian Voll, Ricardo M. Washington, Jonathan Webster, Autumn L. Wenner, Alisha B. White, Anthony Johnson, and John McNamara are all currently or formerly employed as Officers at the DCC, and each agrees that the Representative Plaintiffs are similarly situated to them and are qualified and appropriate representatives of all of the Plaintiffs and the entire class.

18.     All of the Plaintiffs bringing this First Amended Complaint have been subjected to the same policies, procedures, and practices by the LFUCG as to compensation (and non-compensation) for hours worked, including but not limited to overtime compensation.

19.     All of the Plaintiffs bringing this First Amended Complaint belief that other current and former DCC Employees are and have been subjected to the same policies, procedures, and

practices by the LFUCG as to compensation (and non-compensation) for hours worked, including but not limited to overtime compensation.

## JURISDICTION AND VENUE

20.     This Court has personal jurisdiction over the Defendant LFUCG, and venue is proper in this Court.

21.     The damages sought by the Plaintiffs, individually and on behalf of all other similarly situated current and former DCC employees, exceed the jurisdictional minimum of this Court.

## FACTUAL ALLEGATIONS

**A.     General Factual Background**

22.     The LFUCG is, and at all times relevant to this action has been, an "employer" subject to the provisions of the FLSA and the Kentucky Act.

23.     At all times relevant to this action, the LFUCG has had at least four hundred (400) full-time Employees working at the DCC.

24.     The Plaintiffs, and all other similarly situated current and former DCC Employees, are, and at all times relevant to this action have been, "employees" entitled to the protections of the FLSA and the Kentucky Act.

25.     The LFUCG is, and at all times relevant to this action has been, subject to the requirement under 29 U.S.C. § 207 and KRS 337.285 that employees may not work more than forty (40) hours per week without receiving "overtime" compensation at a rate not less than one and one-half times the regular rate of salary.

26.     The LFUCG is, and at all times relevant to this action has been, subject to the requirement that full-time employees must receive a bona fide meal period, typically of at least thirty

(30) minutes, and during which they are not to be on duty or required to perform any active or inactive work duties, as set out in 29 CFR 785.19(a) and KRS 337.355.

27.     The LFUCG is, and at all times relevant to this action has been, subject to the requirement that full-time employees must receive bona fide rest periods of at least ten (10) minutes for every four (4) hours worked, which shall be in addition to the employees' statutory meal periods and which are compensable work time, as set out in 29 CFR 785.19 and KRS 337.365.

28.     The LFUCG is, and at all times relevant to this action has been, subject to the requirement that "Compensatory Time" may not be used as a means to avoid statutory overtime compensation, that the granting of Compensatory Time in lieu of overtime must be made only upon the request of a county employee, made freely and without coercion, pressure, or suggestion by the employer, and that all unused accrued Compensatory Time must be paid at a statutory rate to a county employee whose employment is terminated, as set out in KRS 337.285.

29.     The LFUCG is, and at all times relevant to this action has been, subject to the requirement that any employee receiving Compensatory Time in lieu of overtime do so only under agreement, that an employee who has accrued Compensatory Time and whose employment terminates must be paid for the unused Compensatory Time at the statutory rate, and that an employee receiving Compensatory Time must be permitted to make reasonable use of his or her accrued Compensatory Time, pursuant to 29 U.S.C. § 207(o).

30.     The rules, practices, and procedures described in this Complaint have been applied by the LFUCG to DCC Employees since at least 1989.

31.     The LFUCG employs (or has formerly employed) the Plaintiffs and other similarly-situated current and former DCC Employees who are directly responsible for the safety and security of the DCC facility and of its inmates.

32.     LFUCG requires each DCC Employee to work in one of three (3) shifts: the First Shift (8:00 a.m. to 4:00 p.m.), the Second Shift (4:00 p.m. to 12:00 a.m.), or the Third Shift (12:00 a.m. to 8:00 a.m.).

33.     LFUCG requires all DCC Employees to work a minimum forty-hour work week.

34.     The compensated work day for DCC Employees begins five (5) minutes before the start of his or her Shift, and continues until fifteen (15) minutes after the end of his or her Shift, excluding a twenty-minute purported "Meal Period."

35.     The DCC is comprised of five (5) separate Bureaus (or departments), including the Custody Bureau, the Intake Bureau, the Master Control Bureau, the Auxiliary Bureau, and Programs Bureau.

36.     Inmates detained at the DCC are situated in separate and numerous "Units."

37.     Certain DCC Employees are assigned to work in and to be responsible for particular Units.

38.     DCC Employees are "ranked" in the following order: Officers, Corporals, Sergeants, Lieutenants, Captains, and Majors.

39.     The DCC's facility is over 400,000 square feet, with varying distances between each Unit and the Shift Command office in the center of the facility.  For example, an average DCC Employee would require nearly four (4) minutes (depending on whether the locked doors in the hallways were closed and had to be unlocked) to travel from the Shift Command office to the most distant Unit.

40.     During any Shift, and in any Unit, it is common for a "tone" to signal an "emergency" situation.  Such a tone commonly sounds two or more times during any Shift, but may sound more frequently.  The tones signal situations such as inmate fights or the need for medical attention.

41.     "Lock downs" commonly occur at the DCC facility during any Shift.  When a lock down occurs, DCC Employees are not able to enter or exit through the main doorways to the facility, or through the doorways between the Units, between the Units and the Shift Command office, and between the Units and the Officers' Dining Room ("ODR").

42.     On information and belief, the LFUCG has never posted and does not currently post in a clear and conspicuous manner at the DCC facility the information required to be posted under 29 CFR 516.4 and KRS 337.325.

43.     As a direct result of the LFUCG's failure to post the above-described information in a clear and conspicuous manner, the Plaintiffs and all other current and former DCC Employees have been deprived of their ability to learn of their rights under the FLSA and the Kentucky Act.

**B.     The DCC Employees' Pre-Shift Briefings and Other Pre-Shift Work**

44.     The DCC Employees are required by the LFUCG to attend "Pre-Shift Briefings," or meetings, which begin at least five (5) minutes before the starting time of each Shift.  Thus, Pre-Shift Briefings begin no later than 7:55 a.m. (as to the First Shift), 3:55 p.m. (as to the Second Shift), and 11:55 p.m. (as to the Third Shift).

45.     Pre-Shift Briefings regularly last past the starting times of the Shifts.

46.     DCC Employees are working and on duty from at least the time at which his or her Pre-Shift Briefings begin, and they are working and on duty throughout the Pre-Shift Briefings.

47.     Pre-Shift Briefings are held in order to address important daily safety issues, such as whether a particular inmate is physically combative, or is behaving in a dangerous matter (e.g., spitting or throwing blood), and are therefore integral and indispensable to the DCC's principal activities of maintaining custody and control of inmates.

48.     Prior to appearing at the mandatory Pre-Shift Briefings, DCC Employees must be dressed in their uniforms, have all required accessories, and be ready to begin their Shifts.

49.     During Pre-Shift Briefings, the LFUCG does not permit DCC Employees to conduct any personal activities or pursue their own interests.

50.     If any DCC Employee is not present for a Pre-Shift Briefing five (5) minutes before the hour on which his or her Shift begins, he or she is marked as "tardy" by his or her Commander for that Shift.

51.     The LFUCG disciplines DCC Employees if they incur more than three (3) "tardy" entries.  Although the DCC's Policy and Procedure Manual states that DCC Employees will be disciplined for more than three (3) "tardy" entries which occur within a one-year period, the LFUCG's practice is to discipline DCC Employees for incurring three or more "tardy" entries over periods longer than one year.

52.     If any DCC Employee arrives at a Pre-Shift Briefing more than seven (7) minutes after it begins (in other words, more than two (2) minutes after the hour on which his or her relevant Shift begins), he or she is required to forfeit one (1) hour of his or her accrued sick time or vacation time or is docked pay.

53.     Frequently, the first DCC Employee to arrive at a Pre-Shift Briefing is instructed to go to an area hospital and to relieve another DCC Employee who is guarding an inmate/patient.

54.     When instructed to assume guard duties of an inmate at a hospital, a DCC Employee must begin work duties earlier than five (5) minutes prior to the start of his or her Shift.

55.     DCC Employees are not compensated in any way for this pre-Shift work time of assuming guarding duties of an inmate at a hospital.

**C.     Post-Shift Work Requirements**

56.     DCC Employees remain on working duty for at least fifteen (15) minutes after the end of his or her Shift.

57.     The LFUCG does not allow DCC Employees to leave their Units at the end of a Shift until they are "relieved" by the employees who are replacing them in their Units on the next Shift (the relieving employees are referred to herein as "Replacements").

58.     Because of the length of a Replacement's Pre-Shift Briefing, and the amount of time required in order for the Replacement to travel to the Unit to which he or she is assigned, a Replacement may not arrive at the Unit until after the starting time of the Replacement's Shift.

59.     After a Replacement arrives at a Unit, the departing DCC Employee is required to brief the Replacement about any important safety issues or other issues pertaining to the Unit or Bureau, the inmates, and/or the security of the DCC facility.

60.     After a Replacement arrives at a Unit, a departing DCC Employee is required to wait at the Unit after the end of his or her Shift while the Replacement completes a "walk-through" of the Unit, is briefed, and performs a "head count" of the Unit's inmates.

61.     DCC Employees remain on working duty during the time which they spend after the end of their Shifts while waiting for their Replacements to arrive, while briefing their Replacements, and while waiting for Replacements to perform "walk-throughs" and "head counts."

62.     Before a DCC Employee is permitted to leave the DCC facility after the end of his or her Shift, he or she must print, review, and sign a "Shift Report," which is a log of the activities which have occurred in that DCC Employee's Unit or Bureau during his or her Shift.

63.     Although the print command for the Shift Report must be given at the DCC Employee's Unit, the Shift Report prints only at the Shift Command office, which is in the center of the DCC's facility. Therefore, prior to leaving the DCC facility, a DCC Employee must print the

Shift Report from his or her Unit, then walk from that Unit to the Shift Command office, and then pick up, review, and sign the Shift Report.

64.     Because the doors between the Units are controlled (e.g., many are locked until a request to open is granted), a considerable amount of time is required in order for DCC Employees assigned to Units which are distant from the Shift Command office to walk to the Shift Command office in order to pick up, review, and sign their Shift Reports.

65.     Because a "lock down" may occur at the DCC's facility during the time in which a DCC Employee is walking from his or her Unit to the Shift Command Office in order to pick up, review, and sign their Shift Reports, a DCC Employee may be forced to wait between locked doors in a hallway for considerable periods of time.

66.     DCC Employees are working and on duty during the time which they must spend traveling from their Units to the Shift Command Office in order to pick up, review, and sign their Shift Reports.

67.     DCC Employees frequently and regularly remain on working duty after the end of their regular compensated work day (for example, while waiting for Replacements to arrive, to be briefed, and to perform head counts and walk throughs, while attempting to travel from their Units to the Shift Command office, and while printing, reviewing, and signing their Shift Reports), but DCC Employees are not paid overtime for the additional time which they must spend on working duty at the DCC facility unless they are specifically assigned to work overtime shifts.

68.     On occasions when the LFUCG requires a DCC Employee to work overtime, he or she is considered to be working "overtime" from the time his or her regular Shift ends, including the time that is required for the Employee to print out his or her Shift Report, and then travel to the Shift Command office in order to retrieve, review, and sign the Shift Report.  Thus, the LFUCG

acknowledges that DCC Employees are working and on-duty while traveling from their Units to the Shift Command and while retrieving, reviewing, and signing the Shift Reports.

69.     For example, a DCC Employee assigned to work a Shift ending at 4:00 p.m. may not even be able to leave his or her Unit until 4:15 p.m. or later (due to delays in the arrival of a Replacement and/or waiting for the Replacement to complete a walk through or head count), and may be delayed due to lock-downs or tones while traveling from the Unit to Shift Command, and must then retrieve, review, and sign his or her Shift Report, all before being permitted by the LFUCG to leave the DCC facility, but that DCC Employee is not compensated for time spent on working duty after 4:15 p.m. unless specifically assigned to work overtime on that date.

70.     When DCC Employees are required to remain at the DCC facility longer than fifteen (15) minutes after the end of their Shifts, resulting in the DCC Employees remaining on working duty for longer than eight (8) hours, the LFUCG requires those DCC Employees to complete falsified time records reflecting that they have worked only eight (8) hours per work day, unless overtime has been specifically assigned.

71.     DCC Employees who are assigned to work as "Rovers" (e.g., to relieve other DCC Employees while they attempt to take so-called Meal Periods or Rest Periods) are required by the LFUCG to assemble and organize all Shift Reports from their assigned Shifts, and to deliver those Shift Reports to the Shift Commanders prior to leaving the DCC facility.

72.     If any DCC Employee whose Shift is ending is delayed in completing his or her Shift report (for example, due to a delay in the arrival of that DCC Employee's Replacement), all DCC Employees assigned to work as Rovers for that ending Shift are required by the LFUCG to remain at the DCC Facility until all Shift Reports for that ending Shift are completed, assembled, and organized, and delivered to the Shift Commanders.

73.     Although they are on working duty while waiting for all Shift Reports to be completed, and while assembling and organizing the Shift Reports and delivering them to the Shift Commanders, Rovers are not compensated by the LFUCG for the time which they are required to spend on working duty between fifteen (15) minutes after the end of their Shifts until the time at which they are permitted to leave the DCC facility.

74.     For example, a Rover whose Shift ends at 4:15 p.m. may frequently be required by the LFUCG to remain at the DCC Facility on working duty after 4:15 p.m., but is not normally compensated by the LFUCG for the additional time spent on working duty.

**D.     Meal Periods and Rest Periods**

75.     The LFUCG grants DCC Employees no more than twenty (20) minutes for "Meal Periods."

76.     DCC Employees are not compensated for the twenty-minute Meal Periods.

77.     During the Meal Periods, if DCC Employees want food from the ODR, they must walk from their Units to the ODR and return from the ODR to their Units.

78.     Because the Meal Period is only twenty (20) minutes, DCC Employees on almost all occasions must eat their meals in their Units.  DCC Employees are not permitted to leave the DCC facility during their Meal Periods.

79.     For DCC Employees who are assigned to Units which are physically distant from ODR, the twenty-minute Meal Period is not a sufficient amount of time in which to obtain food from the ODR, return to their Units, and eat.  As a result, many DCC Employees have no actual Meal Period.

80.     A DCC Employee is not permitted to leave his or her Unit to obtain food from the ODR until another DCC Employee, known as a "Rover," arrives at the Unit and assumes the post

of the DCC Employee who is attempting to take a Meal Period.  If a "tone" sounds while the Rover is in the Unit and while the DCC Employee attempting to take a Meal Period is traveling to the ODR or retrieving food from the ODR, the latter must immediately respond to the tone despite the fact that he or she is attempting to take a Meal Period and even if he or she has not yet been able to retrieve food from the ODR.

81.     Because DCC Employees are required to immediately respond if a "tone" sounds while they are traveling to the ODR, they remain on work duties throughout the Meal Period.

82.     DCC Employees are required by the LFUCG to perform other work duties during Meal Periods, including but not limited to obtaining food and drink for "Trustees" (inmates entrusted with work responsibilities).

83.     DCC Employees are therefore required by the LFUCG to remain on working duty during Meal Periods.

84.     DCC Employees with the rank of Sergeant, Lieutenant, Captain, and Major are required by the LFUCG to perform paperwork and to accept work-related telephone calls during their Meal Periods.

85.     DCC Employees with the rank of Sergeant, Lieutenant, Captain, and Major are therefore required by the LFUCG to remain on working duty during Meal Periods.

86.     DCC Employees are entitled to two (2) ten-minute "Rest Periods" during their Shifts.

87.     DCC Employees are required to perform work activities during Rest Periods, including but not limited to the following: bringing coffee or juice to Trustees, responding to tones, checking razors used by inmates, and delivering laundry to inmates.

88.     DCC Employees are therefore required by the LFUCG to remain on working duty throughout their Rest Periods.

89.     When a DCC Employee is required by the LFUCG to remain on working duty throughout his or her Meal Period or Rest Periods, and is therefore required to work longer than eight (8) hours in a day, the LFUCG requires that DCC Employee to complete falsified time records reflecting that he or she has worked only eight (8) hours per work day, unless overtime has been specifically assigned.

90.     DCC Employees assigned to work as "Rovers" are often required by the LFUCG to forego Meal Periods or Rest Periods altogether because they are required to relieve other DCC Employees attempting to take a so-called "Meal Period."

91.     Even when DCC Employees (including Rovers) are required to forego Meal Periods or Rest Periods altogether, they are required by the LFUCG to complete falsified time records to reflect that they did take Meal Periods or Rest Periods.

92.     When DCC Employees are required to work overtime Shifts, they must begin their overtime Shift immediately after the end of their regular work day and they are not given any Rest Periods between their regular work days and their overtime Shifts.

**E.      Uncompensated Time Spent Waiting to Ask Shift Commanders Whether Overtime Is Required**

93.     The LFUCG requires DCC Employees with the rank of Corporal or Officer to be available to work "overtime" (time beyond their regularly-assigned Shifts) on at least two (2) days out of every five (5) working days.

94.     On the days on which they are assigned to be available for overtime work, DCC Employees are not permitted to leave the DCC Facility after signing their Shift Reports at the Shift Command office until they confirm with their Shift Commanders whether or not they will be required to remain at the DCC facility and to work overtime or another Shift.

95.     Because Shift Commanders may be in meetings or otherwise occupied, and therefore unavailable to inform DCC Employees whether they must work overtime, DCC Employees must often wait at the DCC Facility (at least two (2) days out of every five (5) working days) even after signing their Shift Reports and after the end of their regular workday in order to learn whether or not they are required to work overtime.

96.     If, after waiting to confirm with his or her Shift Commander whether overtime is required, a DCC Employee is instructed to remain at the DCC Facility and to work overtime, he or she is deemed to have worked overtime from the time his or her Shift ends (or, at least from fifteen minutes after the Shift ends), including the time spent waiting to confirm whether overtime is required.

97.     Thus, the LFUCG recognizes and acknowledges that the time spent by DCC Employees waiting to confirm whether overtime is required (on at least two (2) days out of every (5) working days for each DCC Employee) is on-duty working time.

98.     If, after waiting to confirm with his or her Shift Commander whether overtime is required, a DCC Employee is instructed that he or she will not be working overtime, he or she is not compensated for the time spent waiting to confirm whether overtime is required.

**F.     Uncompensated Time Spent Reporting for Shifts Not Worked**

99.     The LFUCG regularly requires DCC Employees who have been assigned to work overtime Shifts to appear at the DCC Facility and to attend Pre-Shift Briefings for their subsequent regularly assigned Shifts, but then informs those DCC Employees that they are not permitted to work their regular Shifts and must leave the DCC facility.

100.    The LFUCG does not compensate DCC Employees for the time which they must spend reporting to the DCC Facility and the time which they spend on working duty throughout the Pre-Shift Briefings if they are ultimately not permitted to work their assigned Shifts.

101.    The LFUCG previously compensated DCC Employees with a payment representing two (2) hours worth of time for requiring them to report to the DCC Facility and to attend Pre-Shift Briefings but then not permitting them to work their assigned Shifts, but the LFUCG has discontinued that policy.

**G.     Time Spent Waiting Between Shifts and Mandatory Classes**

102.    The LFUCG regularly requires DCC Employees to attend Classes which are not held during their regularly-assigned Shifts.

103.    When required to attend a Class that occurs after the end of a regularly-assigned Shift, a DCC Employee who, because of scheduling, remains at the DCC facility after the end of his or her regular Shift must also remain available for emergency duty for the time period between the end of his or her regular work day and the beginning of the Class.

104.    The LFUCG does not compensate DCC Employees with ranks of Sergeant and below for the time which they spend at the DCC Facility and available for work between retrieving and signing their Shift Reports and the beginning of mandatory Classes.

105.    The LFUCG awards only Compensatory Time (described below in Paragraphs 110-115), and no regular or overtime pay, to DCC Employees with ranks of Lieutenant and above for the time which they spend at the DCC facility and available for work between the end of their regular work days and the beginning of mandatory Classes.

**H.     Uncompensated Time and Overtime**

106.     Because DCC Employees are working and on duty from the time their Pre-Shift Briefings begin and until they are permitted to leave their Units and travel to the Shift Command office in order to retrieve, review, and sign their Shift Reports, and because DCC Employees are required to remain on working duty throughout their Meal Periods and their Rest Periods, the daily on-duty work time for DCC Employees regularly exceeds eight (8) hours, and the weekly on-duty work time for DCC Employees regularly exceeds forty (40) hours.

107.     Because the LFUCG does not compensate DCC Employees for their on-duty work time spent guarding inmates at hospitals prior to five (5) minutes before the time at which their Shifts begin, the daily on-duty work time for DCC Employees regularly exceeds eight (8) hours, and the weekly on-duty work time for DCC Employees therefore regularly exceeds forty (40) hours.

108.     Because DCC Employees are required to remain at the DCC facility and on working duty while waiting to confirm with their Shift Commander whether overtime is required on the days on which they are assigned to be available for overtime, but are not paid for that on-duty work time unless they are ultimately instructed to remain for overtime work, the daily on-duty work time for DCC Employees regularly exceeds eight (8) hours, and the weekly on-duty work time for DCC Employees therefore regularly exceeds forty (40) hours.

109.     Because those DCC Employees who remain at the DCC facility for mandatory Classes which begin after the end of their regular workday must remain on working duty between the end of their regular workday and the beginning of the Class, the daily on-duty work time for DCC Employees regularly exceeds eight (8) hours, and the weekly on-duty work time for DCC Employees therefore regularly exceeds forty (40) hours.

110.    Unless DCC Employees are assigned to work overtime, they do not receive any overtime or other compensation for the amount of time which they are on working duty beyond forty (40) hours per week.

**I.      Compensatory Time**

111.    The LFUCG requires DCC Employees who are ranked as Lieutenants, Captains, and Majors to be available to work overtime and to work overtime; however, those DCC Employees are not compensated for overtime worked with overtime pay.  Instead, those DCC Employees receive only an award of "Compensatory Time" from the LFUCG.

112.    The LFUCG does not allow DCC Employees to accrue more than eighty (80) hours of unused Compensatory Time.

113.    Because the LFUCG wishes to avoid the expense of paying overtime to DCC Employees ranked below the rank of Lieutenant, DCC Employees with the rank above Sergeant are most frequently required to work overtime hours in order to complete tasks such as paperwork.

114.    DCC Employees who terminate their employment with the LFUCG are not paid for any Compensatory Time which they have accrued prior to the date of termination.

115.    Because of the LFUCG's limitations on the accrual and use of Compensatory Time, DCC Employees who are required to accept Compensatory Time rather than overtime pay are essentially and practically uncompensated for the overtime hours worked by them.

116.    The LFUCG's limitations and restrictions on the accrual and use of Compensatory Time are so severe that some DCC Employees, including some of the Representative Plaintiffs, have voluntarily chosen demotions in order to receive overtime pay rather than Compensatory Time.

**J.      Retaliatory Activity**

117.    On information and belief, forty (40) DCC Employees received "Coaching and Counseling" Forms ("the Forms") on or about September 19, 2006, from their supervisors.  (See Affidavits and Forms, attached as collective Exhibit A).

118.    The Forms disciplined the DCC Employees for allegedly failing to "document" their Meal and Rest Periods on sign out sheets.

119.    On information and belief, some DCC Employees who received the Forms did not receive breaks while on their shifts, but were nevertheless disciplined for not documenting their Rest Periods.

120.    The Forms are the first step in a graduated disciplinary system employed by the LFUCG as to DCC Employees.

121.    The Forms remain in DCC Employees' personnel files indefinitely. (See Affidavits, Exhibit A).

122.    The supervisor(s) who issued the Forms on or about September 19, 2006 were aware of the action that had been initiated by the Representative Plaintiffs against the DCC.

123.    The issuing of the Forms constitutes an adverse employment action against the DCC Employees.

124.    At least one supervisor directly and expressly informed a DCC Employee, the Plaintiff Jolynn Trent, that the issuance of the Forms on or about September 19, 2006, was due to filing of this lawsuit on September 6, 2006. (See Affidavits, Exhibit A).

125.    Some or all of the recipients of the DCC Forms had either initiated or were about to initiate claims in this lawsuit.

126.    By issuing the Forms to the DCC Employees, the LFUCG has discriminated and retaliated against persons who either have or were about to initiate claims in this lawsuit.

- 21 -

127.    The DCC Employees who received the Forms on or about September 19, 2006, have been harmed by the issuance of those Forms.

**K.      Collective and Class Action Allegations**

128.    Pursuant to 29 U.S.C. § 216(b), the Plaintiffs bring this action on behalf of themselves and on behalf of all DCC Officers currently and formerly employed by the LFUCG.

129.    The Plaintiffs in this action and all DCC Officers currently and formerly employed by the LFUCG were subject to the LFUCG's common employment policies, practices, and procedures and are therefore similarly situated.

130.    The Plaintiffs believe that there are similarly situated current and former full-time DCC Employees who have claims under the FLSA based on the same employment policies, practices, and procedures which are set out in this Complaint.

131.    The Plaintiffs bring this action as a collective action under § 216(b).

132.    Pursuant to Fed. R. Civ. P. 23, the nine (9) Representative Plaintiffs bring this action behalf of themselves and on behalf of a Class of all current and former full-time DCC Employees.

133.    The size of the requested Class is so numerous (over 400 persons) that joinder of the individual members is impracticable.

134.    The Representative Plaintiffs are adequate class representatives because they are directly impacted by the above-described LFUCG practices.  The interests of the Representative Plaintiffs are not antagonistic to, or in conflict with, the interests of the other Class members or with the Class as a whole.

135.    The attorneys representing the Representative Plaintiffs have experience in handling complex litigation and in class actions.

136.    Common questions of law and fact predominate among the Class members.  These common questions include questions as to the right of Class members to overtime compensation, to injunctive relief to compel the LFUCG to comply with the FLSA and the Kentucky Act, to compensatory and liquidated damages due to the LFUCG's violations of the FLSA and the Kentucky Act, and to protection from retaliatory measures by the LFUCG.

137.    The claims of the Representative Plaintiffs are typical of the claims of the Class because all Class members are current or former DCC Employees who have been harmed by the LFUCG's violations of the FLSA and the Kentucky Act.

138.    The Representative Plaintiffs are similarly situated to Class members in terms of their job responsibilities, titles, and salaries, and because the Representative Plaintiffs as well as all Class members have been subject to the same policies, procedures, and rules imposed by the LFUCG on full-time DCC Employees.

## COUNT ONE - VIOLATION OF FLSA

139.    The Plaintiffs repeat and incorporate by reference each allegation set forth above as if fully set forth herein.

140.    The LFUCG has violated the FLSA, willfully, deliberately, intentionally, and otherwise, by refusing to pay overtime or any other compensation to DCC Employees for the time which they spend working and on duty beyond forty (40) hours per week, due to any or all of the following LFUCG requirements:

    a.    Requiring that DCC Employees work shifts of eight (8) hours and twenty (20) minutes (or longer) without providing the meal and rest periods required by law;

    b.    Requiring that DCC Employees continue work duties throughout Meal Periods and Rest Periods;

c.      Requiring that DCC Employees begin their work duties at least as early as the Pre-Shift Briefing, and, in instances where DCC Employees are instructed to assume guard duties at a hospital, earlier than the Pre-Shift Briefing;

d.      Requiring that DCC Employees remain on working duty until their Replacements arrive, and are briefed, and have completed head counts and walk throughs;

e.      Requiring that DCC Employees remain on working duty while traveling from the Units to the Shift Command office;

f.      Requiring that DCC Employees remain on working duty while retrieving, reviewing, and signing their Shift Reports at the Shift Command office (and, in the case of Rovers, while waiting for all Shift Reports to be assembled, organized, and delivered to the Shift Commander); and/or

g.      Requiring that DCC Employees remain on working duty while waiting to confirm with their Shift Commander whether overtime is required (if overtime is not ultimately assigned).

141.    LFUCG has violated the FLSA, willfully, deliberately, intentionally, and otherwise, by refusing to pay overtime or any other compensation to DCC Employees for the time which they spend working and on duty beyond forty (40) hours per week due to remaining at the DCC facility between the end of their regularly scheduled work day and the beginning of mandatory Classes which do not occur during their regularly scheduled work day.

142.    LFUCG has violated the FLSA, willfully, deliberately, intentionally, and otherwise, by refusing to pay overtime or any other compensation to DCC Employees for the time which they spend working and on duty in reporting to the DCC facility and attending Pre-Shift Briefings for Shifts which they are ultimately not permitted to work;

143.    LFUCG has violated the FLSA, willfully, deliberately, intentionally, and otherwise, by depriving DCC Employees of Meal Periods which comply with the FLSA.

144.    LFUCG has violated the FLSA, willfully, deliberately, intentionally, and otherwise, by depriving DCC Employees of Rest Periods which comply with the FLSA.

145.    LFUCG has violated the FLSA, willfully, deliberately, intentionally, and otherwise, by improperly and unlawfully awarding Compensatory Time to some DCC Employees in lieu of overtime pay.

146.    LFUCG has violated the FLSA, willfully, deliberately, intentionally, and otherwise, by improperly and unlawfully imposing restrictions on the accrual and use of Compensatory Time to some DCC Employees in lieu of overtime pay.

147.    LFUCG has violated the FLSA, willfully, deliberately, intentionally, and otherwise by improperly and unlawfully taking adverse employment action against certain DCC employees in retaliation for said employees exercising their rights under the FLSA by commencing suit against the LFUCG.

148.    As a result of the LFUCG's violations of the FLSA, willful, deliberate, intentional, and otherwise, the Plaintiffs and all other similarly-situated current and former DCC Employees have suffered, and continue to suffer, damages in the form of earned but unpaid wages (for regular time and overtime), as well as liquidated damages under 29 U.S.C. § 216(b), in a total amount to be determined at trial.

149.    As a result of the LFUCG's violations of the FLSA, willful, deliberate, intentional, and otherwise, the Plaintiffs and all other similarly-situated current and former DCC Employees are entitled to recover their attorneys' fees and costs incurred in bringing this action under 29 U.S.C. § 216(b).

## COUNT TWO - VIOLATION OF KRS CHAPTER 337

150.    The Plaintiffs repeat and incorporate by reference each allegation set forth above as if fully set forth herein.

151.    The LFUCG has violated the Kentucky Wage and Hour Act ("the Kentucky Act"), KRS Chapter 337, willfully, deliberately, intentionally, and otherwise, by refusing to pay overtime or any other compensation to DCC Employees for the time which they spend working and on duty beyond forty (40) hours per week, due any or all of the following LFUCG requirements:

a.    Requiring that DCC Employees work shifts of eight (8) hours and twenty (20) minutes (or longer) without providing the meal and rest periods required by law;

b.    Requiring that DCC Employees begin their work time at least as early as their Pre-Shift Briefings and, in instances where DCC Employees are instructed to assume guard duties at a hospital, earlier than the Pre-Shift Briefing;

c.    Requiring that DCC Employees continue work duties throughout Meal Periods and Rest Periods;

d.    Requiring that DCC Employees begin their working duty at least as early as the Pre-Shift Briefing, and, in instances where DCC Employees are instructed to assume guard duties at a hospital, earlier than the Pre-Shift Briefing;

e.    Requiring that DCC Employees remain on working duty until their Replacements arrive, and are briefed, and have completed head counts and walk throughs;

f.    Requiring that DCC Employees remain on working duty while traveling from the Units to the Shift Command office;

g.    Requiring that DCC Employees remain working duty while retrieving, reviewing, and signing their Shift Reports at the Shift Command office (and, in the case of

Rovers, while waiting for all Shift Reports to be assembled, organized, and delivered to the Shift Commander); and/or

h.      Requiring that DCC Employees remain on working duty while waiting to confirm with their Shift Commander whether overtime is required (if overtime is not ultimately assigned).

152.    The LFUCG has violated the Kentucky Act by willfully, deliberately, intentionally, and otherwise, by refusing to pay overtime or other compensation to DCC Employees for the time which they spend working and on duty beyond forty (40) hours per week due to remaining at the DCC Facility between the end of their regularly scheduled work day and the beginning of mandatory Classes which do not occur during their regularly scheduled work time.

153.    The LFUCG has violated the Kentucky Act by refusing to pay overtime or any other compensation to DCC Employees for the time which they are required to spend working and on duty in reporting to the DCC facility and in attending Pre-Shift Briefings for Shifts which they are ultimately not permitted to work.

154.    The LFUCG has violated the Kentucky Act, willfully, deliberately, intentionally, and otherwise by depriving DCC Employees of Meal Periods which comply with the Kentucky Act.

155.    The LFUCG has violated the Kentucky Act, willfully, deliberately, intentionally, and otherwise by depriving DCC Employees of Rest Periods which comply with the Kentucky Act.

156.    The LFUCG has violated the Kentucky Act, willfully, deliberately, intentionally, and otherwise by improperly and unlawfully awarding Compensatory Time to some DCC Employees in lieu of overtime pay.

157.    The LFUCG has violated the Kentucky Act, willfully, deliberately, intentionally, and otherwise by improperly and unlawfully imposing restrictions on the accrual and use of Compensatory Time to some DCC Employee in lieu of overtime pay.

158.    The LFUCG has violated the Kentucky Act, willfully, deliberately, intentionally, and otherwise by improperly and unlawfully taking adverse employment action against certain DCC employees in retaliation for said employees exercising their rights under the Kentucky Act by commencing suit against the LFUCG.

159.    As a result of the LFUCG's violations of the Kentucky Act, willful, deliberate, intentional, and otherwise, the Plaintiffs and all other similarly-situated current and former DCC Employees have suffered damages, and continue to suffer damages, in the form of earned but unpaid wages (for both regular time and overtime) and liquidated damages under KRS 337.385, in a total amount to be determined at trial.

160.    As a result of the LFUCG's violations of the Kentucky Act, willful, deliberate, intentional, and otherwise, the Plaintiffs and all other similarly-situated current and former DCC Employees are entitled to recover their attorneys' fees and costs incurred in bringing this action under KRS 337.385.

**COUNT THREE - TEMPORARY INJUNCTIVE RELIEF**

161.    The Plaintiffs repeat and incorporate by reference each allegation set forth above as if fully set forth herein.

162.    Through the actions and inactions described in this Complaint, the LFUCG has deprived and continues to deprive the Plaintiffs and all other similarly situated current and former DCC Employees of their concrete, personal rights under the FLSA and the Kentucky Act.

- 28 -

163.    The LFUCG's continued violations of the FLSA and the Kentucky Act will result in immediate and irreparable harm to the Plaintiffs and to all other similarly situated current and former LFUCG employees who are working or have worked at the DCC.

164.    Pursuant to Fed. R. Civ. P. 65, the Plaintiffs request, on behalf of themselves and on behalf of all other similarly situated current and former DCC Employees, the issuance of a temporary injunction against the following practices, policies, and procedures of the LFUCG, pending the conclusion of this action:

a.    Requiring that DCC Employees work shifts of eight (8) hours and twenty (20) minutes without providing the meal and rest periods required by law;

b.    Refusing to pay overtime or any other compensation to DCC Employees for the time which they spend working and on duty beyond forty (40) hours per week, due to LFUCG rules, requirements, policies, and procedures, applicable to all full-time DCC Employees, which include but are not limited to the following: the requirement that DCC Employees begin their work time at least as early as their Pre-Shift Briefings and, in instances where DCC Employees are instructed to assume guard duties at a hospital, earlier than the Pre-Shift Briefing; the requirement that DCC Employees continue work duties throughout Meal Periods and Rest Periods; the requirement that DCC Employees remain on working duty until their Replacements arrive and are briefed and have completed head counts and walk-throughs; the requirement that DCC Employees remain on working duty while traveling from the Units to the Shift Command office; the requirement that DCC Employees remain on working duty while retrieving, reviewing, and signing their Shift Reports at the Shift Command office (and, in the case of Rovers, while waiting for all Shift Reports from their Shifts

to be assembled, organized, and delivered to the Shift Commanders); and the requirement that DCC Employees remain on working duty while waiting to confirm with their Shift Commander whether overtime is required (if overtime is not ultimately assigned);

c.   Refusing to pay overtime or any other compensation to DCC Employees for the time which they spend working and on duty beyond forty (40) hours per week due to remaining at the DCC Facility between the end of their regularly scheduled work day and the beginning of mandatory Classes which do not occur during their regularly scheduled work day;

d.   Refusing to pay overtime or any other compensation to DCC Employees for the time which they spend working and on duty beyond forty (40) hours per week due to the LFUCG's requirement that DCC Employees report to the DCC Facility and attend Pre-Shift Briefings for Shifts which they are ultimately not permitted to work;

e.   Depriving DCC Employees of Meal Periods which comply with the FLSA and the Kentucky Act;

f.   Depriving DCC Employees of Rest Periods which comply with the FLSA and the Kentucky Act;

g.   Improperly and unlawfully awarding Compensatory Time to some DCC Employees in lieu of overtime pay; and

h.   Improperly and unlawfully imposing restrictions on the accrual and use of Compensatory Time to some DCC Employee in lieu of overtime pay.

i.   Taking any retaliatory, adverse employment action, including but not limited to disciplinary measures, discharge, constructive discharge, changing of shift or job

assignments, or any other change in the terms and conditions of employment, against any DCC Employee, because of such employee's exercise or attempted exercise of said employee's rights under federal or state law.

### COUNT FOUR - PERMANENT INJUNCTIVE RELIEF

165.    The Plaintiffs repeat and incorporate by reference each allegation set forth above as if fully set forth herein.

166.    Through the actions and inactions described in this Complaint, the LFUCG has deprived and continues to deprive the Plaintiffs and all other similarly situated current and former DCC Employees of their concrete, personal rights under the FLSA and the Kentucky Act.

167.    Pursuant to Fed. R. Civ. P. 65, the Plaintiffs request, on behalf of themselves and on behalf of all other similarly situated current and former LFUCG employees, the issuance of a permanent injunction against the following practices, policies, and procedures of the LFUCG, to remain in place, without bond, until the conclusion of this action:

a.    Requiring that DCC Employees work shifts of eight (8) hours and twenty (20) minutes without providing the meal and rest periods required by law;

b.    Refusing to pay overtime or any other compensation to DCC Employees for the time which they spend working and on duty beyond forty (40) hours per week, due to LFUCG requirements which include but are not limited to the following: the requirement that DCC Employees begin their work time at least as early as their Pre-Shift Briefings and, in instances where DCC Employees are instructed to assume guard duties at a hospital, earlier than the Pre-Shift Briefing; the requirement that DCC Employees continue work duties throughout Meal Periods and Rest Periods; the requirement that DCC Employees remain on working duty until their

Replacements arrive and are briefed and have completed head counts and walk-throughs; the requirement that DCC Employees remain on working duty while traveling from the Units to the Shift Command office; the requirement that DCC Employees remain on working duty while retrieving, reviewing, and signing their Shift Reports at the Shift Command office (and, in the case of Rovers, while waiting for all Shift Reports from their Shifts to be assembled, organized, and delivered to the Shift Commanders); and the requirement that DCC Employees remain on working duty while waiting to confirm with their Shift Commander whether overtime is required (if overtime is not ultimately assigned);

c.      Refusing to pay overtime or any other compensation to DCC Employees for the time which they spend working and on duty beyond forty (40) hours per week due to remaining at the DCC facility between the end of their regularly scheduled work day and the beginning of mandatory Classes which do not occur during their regularly scheduled work day;

d.      Refusing to pay overtime or any other compensation to DCC Employees for the time which they spend working and on duty beyond forty (40) hours per week due to the LFUCG's requirement that DCC Employees report to the DCC facility and attend Pre-Shift Briefings for Shifts which they are ultimately not permitted to work;

e.      Depriving DCC Employees of Meal Periods which comply with the FLSA and the Kentucky Act;

f.      Depriving DCC Employees of Rest Periods which comply with the FLSA and the Kentucky Act;

g.      Improperly and unlawfully awarding Compensatory Time to some DCC Employees in lieu of overtime pay; and

h.      Improperly and unlawfully imposing restrictions on the accrual and use of Compensatory Time to some DCC Employee in lieu of overtime pay.

i.      Taking any retaliatory, adverse employment action, including but not limited to any disciplinary actions, discharge, constructive discharge, changing of shift or job assignments, or any other change in the terms and conditions of employment, against any DCC Employee, because of such employee's exercise or attempted exercise of said employee's rights under federal or state law.

**COUNT FIVE - RECOVERY OF PENSION CONTRIBUTIONS**

168.    The Plaintiffs repeat and incorporate by reference each allegation set forth above as if fully set forth herein.

169.    On information and belief, some members of the proposed Class have retired from or left their employment with the LFUCG.

170.    On information and belief, the pension contributions made by the LFUCG on behalf of some proposed Class members were based on the average pay received by those Class members during the last three (3) to five (5) years of their employment by the LFUCG.

171.    Through the above-described actions and inactions, the LFUCG has failed to pay both current and former DCC Employees for the full amount of time worked, including overtime and unpaid Compensatory Time. As a result, the pension payments to the DCC Employees have been improperly calculated, and additional funds are owed for past payments.

172.    Because the pension payments to the DCC Employees have been improperly calculated, liability for additional funds will continue to accrue into the future.

## COUNT SIX - PETITION FOR DECLARATORY RELIEF

173.   The Plaintiffs repeat and incorporate by reference each allegation set forth above as if fully set forth herein.

174.    To the extent any of the policies, procedures, requirements or rules of the LFUCG described in this Complaint, including but not limited to the policy of awarding Compensatory Time to certain DCC Employees in lieu of overtime compensation for hours worked beyond forty (40) hours per week, are based on or set out in any ordinances by the LFUCG, then those ordinances are illegal under the FLSA and/or the Kentucky Act.

175.   An actual controversy and dispute exists between the parties as to the legality of any ordinances enacted by the LFUCG which purport to authorize any of the policies, procedures, requirements, or rules described in this Complaint, including but not limited to the policy of awarding Compensatory Time to certain DCC Employees in lieu of overtime compensation for hours worked beyond forty (40) hours per week, under the FLSA and/or the Kentucky Act.

176.   Any ordinances which purport to allow the policies, procedures, requirements or rules of the LFUCG described in this Complaint, including but not limited to the policy of awarding Compensatory Time to certain DCC Employees in lieu of overtime compensation for hours worked beyond forty (40) hours per week, should be declared by the Court as illegal.

## COUNT SEVEN  - CERTIFICATION OF THE CLASS

177.   The Plaintiffs repeat and incorporate by reference each allegation set forth above as if fully set forth herein.  For the reasons set out in the Renewed Motion to Certify Collective and Class Action, filed contemporaneously with this First Amended Complaint, the Plaintiffs respectfully request that the Court certify a Class under Fed. R. Civ. P. 23, of all persons currently and formerly employed as Officers by the LFUCG DCC.

178.    The Plaintiffs request an Order from the Court directing the LFUCG to provide the names and last known addresses of all persons currently and formerly employed as DCC Officers by the LFUCG and to authorize the issuance of a Notice (in the form of the Notice attached as Exhibit B) to all such persons.

## COUNT EIGHT - COLLECTIVE ACTION STATUS

179.    The Plaintiffs repeat and incorporate by reference each allegation set forth above as if fully set forth herein.  For the reasons set out in the Renewed Motion to Certify Collective and Class Action, filed contemporaneously with this First Amended Complaint, the Plaintiffs respectfully request that the Court grant collective status to this action under 29 U.S.C. § 216(b), and order the issuance of notice to all persons currently and formerly employed as DCC Officers by the LFUCG.

180.    All persons currently and formerly employed as DCC Officers by the LFUCG have been subjected to the same employment policies and practices by the LFUCG described herein.

181.    The Plaintiffs request an Order from the Court directing the LFUCG to provide the names and last known addresses of all persons currently and formerly employed as Officers by the LFUCG DCC and to authorize the issuance of a Notice and Consent Form (in the form of the Notice and Consent Form attached as Exhibit B) to all such persons.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, on behalf of themselves and on behalf of all similarly-situated past and current DCC Employees, respectfully request:

A.    The Certification of a Class pursuant to 29 U.S.C. § 216(b) and Fed. R. Civ. P. 23, to be described as and to include:  all persons currently or formerly employed as Officers by the LFUCG DCC;

B.     An Order directing that this action proceed as a collective action under § 216(b) and that Notice issue to all persons currently and formerly employed as Officers by the LFUCG DCC;

C.     The issuance of temporary and permanent injunctive relief against the following practices, policies, and procedures of the LFUCG;

    I.     Refusing to pay overtime compensation to DCC Employees for the time which they spend working and on duty beyond forty (40) hours per week;

    ii.    Depriving DCC Employees of Meal Periods which comply with the FLSA and the Kentucky Act;

    iii.   Depriving DCC Employees of Rest Periods which comply with the FLSA and the Kentucky Act;

    iv.    Improperly and unlawfully awarding Compensatory Time to some DCC Employees in lieu of overtime pay; and

    v.     Improperly and unlawfully imposing restrictions on the accrual and use of Compensatory Time to some DCC Employee in lieu of overtime pay;

    vi.    Taking any retaliatory, adverse employment action, including but not limited to disciplinary actions, discharge, constructive discharge, changing of shift or job assignments, or any other change in the terms and conditions of employment, against any DCC Employee, because of such Employee's exercise or attempted exercise of said Employee's rights under federal or state law.

D.     Compensatory and liquidated damages;

E.     A declaration by this Court that any ordinances which purport to allow the policies, procedures, or requirements of the LFUCG which are described in this Complaint, including but not limited to the policy that certain DCC Employees receive Compensatory Time in lieu of overtime pay for time worked beyond forty (40) hours per week, then those ordinances are illegal, void and of no effect;

F.     Reasonable attorneys' fees and costs;

G.     A trial by jury on all counts so triable;

H.     Any and all other relief to which they appear entitled.


Respectfully submitted,

**MILLER, GRIFFIN & MARKS, PSC**
271 West Short Street, Suite 600
Lexington, Kentucky 40507-1292
Telephone:  (859) 255-6676
Facsimile: (859) 259-1562

BY:  /s/ Elizabeth C. Woodford
           THOMAS W. MILLER
           DON A. PISACANO
           MICHAEL J. COX
           DAVID T. FAUGHN
           ELIZABETH C. WOODFORD

ATTORNEYS FOR PLAINTIFFS

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been electronically filed through the ECF system this the 28th day of September, 2006, which will send a notice of electronic filing to all parties' counsel in the electronic filing system in this case.

George J. Miller
Brian C. Baugh
Latoi D. Mayo
Sharon L. Gold
WYATT, TARRANT & COMBS, LLP
250 West Main Street
Suite 1600
Lexington, Kentucky 40507-1746

Mitzi D. Wyrick
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street, Suite 2800
Louisville, Kentucky 40202-2898

/s/ Elizabeth C. Woodford
COUNSEL FOR PLAINTIFFS

F:\Share\ew\Pldgs\Crawford\crawford.first amended complaint FINAL.wpd