# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION
## LEXINGTON

**CIVIL ACTION NO. 06-299-JBC**

**JUSTIN CRAWFORD, ET AL.,**                                    **PLAINTIFFS,**

**V.**                        <u>**MEMORANDUM OPINION AND ORDER**</u>

**LEXINGTON-FAYETTE URBAN**
**COUNTY GOVERNMENT,**                                    **DEFENDANT.**

**\* \* \* \* \* \* \* \* \* \* \***

This matter is before the court upon the defendant's motions to decertify the subclasses of Lieutenants and Captains (DE 318), "Subclass B" and "Subclass C" respectively, and to decertify the meal break subclass (DE 319), "Subclass A." The court, having reviewed the record and being sufficiently advised, will grant the motion to decertify "Subclass B" and "Subclass C" and deny the motion to decertify "Subclass A."

## I.    FACTUAL BACKGROUND

The plaintiffs are current and former employees of the defendant, the Lexington-Fayette Urban County Government ("LFUCG"), at LFUCG's Division of Community Corrections ("DCC"). In their complaint, the plaintiffs allege that "the DCC has engaged in long-standing, widespread, and multiple violations of the Fair Labor Standards Act . . ., 29 U.S.C. § 201, et seq., and of the Kentucky Wages

and Hours Act . . ., KRS Chapter 337."[1]  The DCC is responsible for the operation of the Fayette County Detention Center and the Community Alternative Program. The detention center houses hundreds of inmates.  The DCC's organizational structure is pyramidal in shape, with the Director at the apex and approximately three hundred Community Corrections Officers ("Officers") at the base.  Between the Director and the Officers are five levels of ranks which, in descending order under the Director, are Assistant Directors, Majors, Captains, Lieutenants, Sergeants, and the honorary rank of Corporal.  The Division is organized into five bureaus: Administration; Information Services; Operations; Programs, Services and Community Placement; and Professional Standards.  DE 338 at 4.  The Operations bureau consists of the Custody, Intake, Master Control, and Auxiliary Services units.  *Id.*  The Custody unit employees directly supervise and control the inmates, who are confined to the housing units.  *Id.*  The Intake unit employees book arrestees, process them into the facility, obtain and maintain custody of their personal property, and process them out of the facility when they have served their time or are freed on bond.  *Id.*  The Master Control unit employees control access to inmate housing units and other areas of the facility, monitor all areas of the facility using cameras, and man the main lobby used by the public.  *Id.*  Finally, the Auxiliary Services unit employees transport inmates to courts and maintain custody and control of them when they are at the courthouse.  *Id.*  Custody, Intake, and

---

[1]On January 10, 2007, this court granted the defendant's motion to dismiss the plaintiff's state-law claims.  DE 85.

2

Master Control operate 24 hours a day.  DE 304 at 3.  The work period for the three bureaus is eight hours and twenty minutes, with an uncompensated meal break of twenty minutes.  *Id.*  The plaintiffs who are assigned or who have been assigned to Custody, Intake, and/or Master Control allege that they were deprived of a bona fide meal period and are therefore entitled to compensation for that time.

## II.    BONA FIDE MEAL PERIOD

The Fair Labor Standards Act ("FLSA") forbids employers from employing employees for more than forty hours per week without compensating employees at a higher rate.  29 U.S.C. § 207.  Under the FLSA "employ" is defined as "to suffer or permit to work."  29 U.S.C. § 203(g).  While "work" is not defined in the FLSA, the courts have defined "work" to include "physical or mental exertion for the employer's benefit," *Hill v. United States,* 751 F.2d 810, 812 (6th Cir. 1984), as well as stand-by or waiting time.  *Armour & Co. v. Wantock,* 323 U.S. 126, 133 (1944).  Bona fide meal periods ordinarily are not "worktime" under the FLSA.  29 C.F.R. § 785.19(a); *see Reich v. Southern New England Telecommunications Corp.,* 121 F.3d 58, 64 (2d Cir. 1997) ("The central issue in mealtime cases is whether employees are required to "work" as that term is understood under the FLSA")*.*  The Department of Labor ("DOL") has promulgated a regulation defining bona fide meal periods for which no compensation is owed:

> Bona fide meal periods do not include coffee breaks or time for snacks.
> These are rest periods.  The employee must be completely relieved from
> duty for the purposes of eating regular meals.  Ordinarily 30 minutes or
> more is long enough for a bona fide meal period.  A shorter period may

3

be long enough under special conditions.  The employee is not relieved
if he is required to perform any duties, whether active or inactive, while
eating.

29 C.F.R. § 785.19(a).[2]  The regulation further provides that "it is not necessary

that an employee be permitted to leave the premises if he is otherwise completely

freed from duties during the meal period."  29 C.F.R. § 785.19(b).  While not

binding on this court, the regulation serves as guidance in determining whether a

meal period is compensable.  *Hill,* 751 F.2d at 813.

The Sixth Circuit applies a "predominant benefit" standard in determining

whether meal periods are bona fide and, therefore, non-compensable.  Under this

test, "as long as the employee can pursue his or her mealtime adequately and

comfortably, is not engaged in the performance of any substantial duties, and does

not spend time predominantly for the employer's benefit, the employee is relieved

of duty and is not entitled to compensation under the FLSA."  *Hill v. United States,*

751 F.2d 810, 814 (6th Cir. 1984).  Stated differently, the "FLSA requires

remuneration for meal periods during which [an employee] is unable comfortably

and adequately to pass the mealtime because the officer's time or attention is

devoted primarily to official responsibilities."  *Alexander v. City of Chicago*, 994

F.2d 333 (7th Cir. 1993) (citing *Lamon v. City of Shawnee, Kansas,* 972 F.2d

1145, 1155 (10th Cir. 1992)).

---

[2] While a "shorter period may be long enough under special circumstances,"
the DOL classifies periods of 5 to 20 minutes as "rest periods," which "must be
counted as hours worked."  29 C.F.R. § 785.18.

4

"Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case." *Armour & Co. v. Wantock,* 323 U.S. 126, 133 (1944) (time spent on inactive duty may be "work").  Factors which courts consider to determine whether a meal break is bona fide include, but are not limited to, the length of the break, whether the employees remained vigilant during the break, the frequency of interruptions during the break, and whether those employees were allowed to resume their break after an interruption.  *See Myracle v. General Elec. Co.*, 33 F.3d 55 (6th Cir. 1994) (bona fide meal break where employees relieved of substantial duties during meal period and interruptions during breaks were infrequent); *Hill v. United States,* 751 F.2d 810, 814 (6th Cir. 1984) (bona fide meal break where employee was not required to exercise constant vigilance, could eat comfortably without having to be regularly distracted, and only subject to infrequent interruptions); *Berger v. Cleveland Clinic Foundation,* 2007 WL 2902907 (N.D. Ohio 2007) (regulations not dispositive as to non-consecutive nature of break)*; Mendez v. Radec Corp.,* 232 F.R.D. 78,  84 (W.D.N.Y. 2005) ("if it is determined that lunch breaks were rarely interrupted and only for brief periods, then no compensation would be required"); *Bridges v. Amoco Polymers,* 19 F. Supp. 2d 1375 (S.D.Ga. 1997) (although plaintiff was subject to recall, court found meal break predominantly for benefit of employee because she was not required to stay at her duty station, could leave the plant with permission, did not have significant responsibilities during break, and

5

could resume break if interrupted); *Rushing v. Shelby County Government*, 8 F. Supp. 2d 737 (W.D.Tenn. 1997) (meal period inured to benefit of employer and was compensable where correctional center supervisors were required to keep radios on during meals, remain on worksite, and respond to emergencies); *Arnold v. State of Arkansas,* 910 F.Supp. 1385 (E.D. Ark. 1985) ("That an officer is on-call and has some limited responsibilities during meal periods does not alone mean the officer is working.  An officer is entitled to compensation for meal periods if the officer's time or attention is taken up principally by official responsibilities." ); *Blain v. General Elec. Co.*, 371 F.Supp. 857 (W.D. Ky. 1971) (finding 18-minute meal break adequate where employees were free from work during the period).  The employee "bears the burden of proving that he or she performs substantial duties and spends his or her meal time predominately for the employer's benefit."  *Myracle v. General Elec. Co.,* 33 F.3d 55 (6th Cir. 1994).

The DCC's meal break policy provides that employees in Custody, Intake, and Master Control who work an eight-hour-and-twenty-minute shift will receive two paid ten-minute rest breaks and one twenty-minute unpaid meal break. Operational Order 3.1-2b, DE 232 Exhibit B.  The plaintiffs allege that the defendant has violated the FLSA by depriving DCC employees of bona fide meal periods.  Specifically, the plaintiffs now or formerly assigned to Custody, Intake, and Master Control allege that they are required to work and/or remain on duty during their twenty-minute unpaid meal breaks.

6

III.   **CERTIFICATION OF A COLLECTIVE ACTION**

Section 216(b) of the FLSA provides as follows:

Any employer who violates [the minimum wage or maximum hours provisions] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. . . . An action to recover [such] liability may be maintained. . . in any. . . . court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.

29 U.S.C. § 216(b).  To proceed with a collective action under the FLSA, plaintiffs must demonstrate that they are "similarly situated."  This court has adopted a two-tiered certification approach for making that decision.  *See Harrison v. McDonald's Corp.,* 411 F. Supp. 2d 862 (S.D. Ohio 2005).  The first step is to determine whether "notice of the pending action and the opportunity to 'opt-in' should be given to potential class members."  *Id.* at 865.  This notice is authorized when the plaintiffs demonstrate that the members of the proposed class are similarly situated.  *See Ruehl v. Viacom, Inc.,* 500 F.3d 375 (3d Cir. 2007).  At this first stage of conditional certification, a named plaintiff must provide only a "modest factual showing" to demonstrate that he is similarly situated to his proposed co-plaintiffs, and the court's review of this modest showing "is made using a fairly lenient standard," which "typically results in 'conditional certification' of a representative class."  *Comer v. Wal-Mart Stores, Inc.,* 454 F.3d 544, 547 (6th Cir. 2006).

On January 26, 2007, this court conditionally certified a collective action

7

under the FLSA, allowing the plaintiffs to send notice to putative class members

who would then decide whether to opt in to the collective action.  DE 97.  This

court found that the plaintiffs had "met the modest standard of presenting facts

supporting a common legal theory upon which each member is entitled to relief."

*Id.*  The court granted the plaintiffs' motion for approval of the notice and consent

forms on March 12, 2007.  DE 107.  The plaintiffs' notice informed employees

who "currently work for the LFUCG DCC, or [who] have worked for the LFUCG

DCC at any time from September 6, 2003, until the present, as an Officer,

Corporal, Sergeant, Lieutenant, Major, and/or Captain" of their right to participate in

the lawsuit.  DE 107-2.

On May 28, 2008, this court conditionally certified three subclasses defined

as follows:

> "Subclass A", to be comprised of all plaintiffs who, since September 6, 2003, until the present, have been or are now assigned to the Custody, Intake, and/or Master Control Bureaus or "areas" within the DCC, and which shall assert the plaintiffs' conditionally certified collective claim that the LFUCG has a policy and practice of denying the plaintiffs a bona fide meal break; and

> "Subclass B", to be comprised of all plaintiffs who, since September 6, 2003, until the present, have been or are now ranked by the LFUCG as DCC Lieutenants, and which shall assert the plaintiffs' conditionally certified claim that the LFUCG has a policy and practice of improperly awarding "compensatory time" to the plaintiffs in lieu of overtime pay for hours worked by the plaintiffs after forty hours within any workweek; and

> "Subclass C", to be to be comprised of all plaintiffs who, since September 6, 2003, until the present, have been or are now ranked by the LFUCG as DCC Captains, and which shall assert the plaintiffs'

8

conditionally certified claim that the LFUCG has a policy and practice of improperly awarding "compensatory time" to the plaintiffs in lieu of overtime pay for hours worked by the plaintiffs after forty hours within any workweek.

DE 311.

"After notice has been sent and discovery has been completed, the defendant can file a motion for decertification, challenging the court's preliminary determination that other employees are similarly situated." *Harrison,* 411 F. Supp. 2d at 865. Having completed discovery on the above mentioned subclasses, the defendant has moved to decertify all three. The plaintiff does not object to decertification of "Subclass B" and "Subclass C." Thus, the only issue remaining is whether "Subclass A," comprised of over 300 plaintiffs, may proceed as a collective action.

At the second stage, or decertification stage, the court examines more closely the question of whether the members of the class are, in fact, similarly situated. *Comer v. Wal-Mart Stores, Inc.,* 454 F.3d 544 (6th Cir. 2006); *see also White v. MPW Industrial Services, Inc.,* 236 F.R.D. 363, 367 (E.D. Tenn. 2006) ("second stage of the analysis is much more stringent"); *Moss v. Crawford & Co.,* 201 F.R.D. 398, 409 (W.D. Pa. 2000) (court "uses a higher standard to analyze the similarly situated issue"). At this stage, discovery is largely complete and

the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in

9

> plaintiffs are dismissed without prejudice.  The class representatives –
> i.e., the original plaintiffs – proceed to trial on their individual claims.

*White v. MPW Industrial Services, Inc.,* 236 F.R.D. 363, 366 (E.D. Tenn. 2006).

Section 216(b) does not define "similarly situated," but "even at the decertification stage, *similarly* situated does not mean *identically* situated." *Wilks v. Pep Boys,* 2006 WL 2821700, *3 (M.D. Tenn. 2006) (court denying motion to decertify where, "on balance, the differences among the plaintiffs do not outweigh the similarities in the practices to which they claim to have been subjected."). During this stage, a court reviews several factors, including "(1) disparate factual and employment setting of the individual plaintiffs, such as a) job duties; b) geographic location; c) supervision; and d) salary; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Id.*  Under the third factor, *see Moss,* 201 F.R.D. at 410, or sometimes as a separate test, *see Olivo v. GMAC Mortgage Corp.,* 374 F. Supp. 2d 545 (E.D. Mich. 2004), courts balance

> whether certification would serve the purposes of a collective action
> under the FLSA, *e.g.,* whether it would (1) lower the cost of the action
> to individual plaintiffs; and (2) increase judicial utility by providing for
> efficient resolution of many claims in one proceeding . . . . against factors
> such as (1) any prejudice to the defendant; and (2) any judicial
> inefficiencies that may result from allowing plaintiffs to proceed
> collectively.

*Wilks*, 2006 WL 2821700 at *3 (citations omitted).

The court addresses the three factors below.  The plaintiffs assert that their claims are suitable for treatment as a collective action because the defendant has a

10

policy and practice of denying them a bona fide meal break.  After reviewing the substantial discovery completed by the parties, the court concludes that the plaintiffs have demonstrated that they are similarly situated such that collective treatment of their claims is appropriate.

### A.  Plaintiffs' Factual and Employment Settings

Several courts have held that a material factor in a court's analysis of the plaintiffs' factual and employment settings is whether they were all affected by a "single decision, policy, or plan." *Wilks,* 2006 WL 2821700 at * 3; *Falcon v. Starbucks Corp.,* 2008 WL 155313, *5 (S.D.Tex. 2008) (plaintiffs "must show they were affected by a common policy, plan, pattern or practice").  "The existence of this commonality may assuage concerns about plaintiffs' otherwise varied circumstances."  *Wilks,* 2006 WL 2821700 at * 3*; see Hill v. Muscogee County School Dist.,* 2005 WL 3526669, *3 (M.D. Ga. 2005) ("if there is sufficient evidence of an employer's pattern of subjecting employees to the same improper practice, that would be sufficient to warrant a finding of similarity justifying collective adjudication").  The plaintiffs must produce substantial evidence demonstrating that a central policy exists that binds the potential class members together. *Berger v. Cleveland Clinic Foundation,* 2007 WL 2902907, *21 (N.D. Ohio 2007); *see also Hill,* 2005 WL 3526669, at * 2 (plaintiffs "must demonstrate 'reasonable basis' for their claim of a class-wide violation); *Moss,* 201 F.R.D. at 410 ("plaintiffs are required to produce substantial evidence of a single decision,

11

policy or plan") (citing *Thiessen v. General Elec. Capital Corp.,* 996 F.Supp. 1071 (D. Kan. 1998)).

In establishing that they have been subjected to a common policy or practice, the plaintiffs contend that the policies and practices of the DCC result in meal breaks which satisfy neither the Department of Labor regulations nor the "predominant benefit" test adopted by the Sixth Circuit, and which therefore render all of their twenty-minute meal breaks compensable. The plaintiffs urge that they are denied a bona fide meal break on a daily basis because they remain responsive to inmates and other interruptions, perform work duties, and travel to and sign break sheets.[3] The plaintiffs have submitted testimony that supports their contentions that the defendant subjects them to work during their break, thereby

_____

[3] While the plaintiffs also assert that they are all subject to four common policies – the policy requiring the plaintiffs to remain at the facility during their meal breaks; the policy requiring the plaintiffs to remain alert for and responsive to inmate problems during their meal breaks; the policy requiring the plaintiffs to respond to radio, telephone, and other interruptions during their meal breaks; and the practice of requiring the plaintiffs to perform work duties during their meal breaks – the common thread among all four policies is the allegation that the expectations or requirements of the DCC during the meal break denies a bona fide meal break on a daily basis.

Also, as they previously requested in their motion to certify subclasses, the plaintiffs request a possible subdivision of the proposed "Subclass A" to accommodate their claim that the meal periods allotted to Custody Officers and Corporals are compensable not only because they remain on the alert for tones, radio calls, and other interruptions, but also because the DCC has a practice which requires they expend a portion of their break time to sign break sheets. As this court previously found, "the issue of time spent signing break sheets is merely a part of that large subclass of all custody, intake, and master control employees. Whether the sign-in sheet should be a separate interrogatory for the jury can be addressed at the beginning of the trial." DE 311 at 12.

depriving them of a bona fide meal break and compensation.[4]  For instance, the
plaintiffs must remain alert for and responsive to inmate problems during their meal
breaks.  (*See, e.g.,* DE 211 at 22, 59 (DCC Director Ron Bishop testifying that "it's
pretty much mandatory" that the employees respond to Signal 7s, and Codes 100
and 101[5];  DCC makes meals available for the employees so they remain on the
premises and are available should they be needed); DE 195 at 126-27 (Assistant
Director James Kammer testifying that in the custody area, the lieutenants,
sergeants and officers all respond to tones; intake officers capable of coming back
must respond to tones in intake); DE 220 at 19 (Captain Jeffrey Carter testifying
that the staff on break is the only staff that can respond in an emergency
situation); DE 270 at 78 (Sergeant Kenneth Webb testifying he responded to tones
on meal break); DE 296 at 107 (Corporal Clarence Rankin stating that "we were
required to respond if we were available to all tones"); DE 285 at 47 (Corporal
LeRoy Byrd testifying he responded to tones, and all plaintiffs are "expected to
respond because another officer's life is in danger"); DE 290 at 25 (Corporal
Theresa Franklin stating she was required to respond to tones and signals during
her meal period); DE 286 at 18 (Corporal JoAnna Cason stating she was required to

---

[4] Because there is still the issue of whether Lieutenants and Captains are
exempt, and therefore an issue of whether they may participate in the meal break
claim, the court disregarded those eleven individuals' testimony in regard to their
personal duties during their meal break in determining whether the plaintiffs are
similarly situated.

[5]A "Signal 7" signifies that an officer needs assistance and Codes 100 and
101 signify medical emergencies.

13

respond to tones during her meal period); DE 223 at 44 (Corporal Donnita Hughes testifying that she was told during training that if a tone went off, she had to respond whether it was a Signal 7 or a Code 100); DE 70 at 88  (Sergeant Kevin Johnson testifying that officer relieved by rover takes the rover's position and responds to tones while on break); DE 215 at 16 (Major Noland Hill testifying that an officer who is relieved by a rover must respond to a Signal 7); DE 229 at 51 (Lieutenant Letrease Cunningham testifying that employees she supervised had breaks interrupted due to combative inmates in intake); DE 284 at 36 (Corporal Brian Blair testifying he dealt with combative inmates during his meal break); DE 245 at 31(Corporal Tommy Brookshire testifying that "at any time that you were on shift [at the DCC], you were subject to be called for an emergency, at any time. I could have been in the [Officer's Dining Room ("ODR")] and the sergeant – the lieutenant or whoever could have paged and needed help; right that second, I would have had to go."); DE 263 at 48, 53 (Corporal Eric Legear testifying he would respond to tone if in hallway as an Intake officer; responded to tone one to two times per week); DE 70 at 68 (Corporal Jessica Herbel testifying that if she was on her way to the ODR and a tone goes off, she would respond to that custody unit); DE 288 at 30, 66 (Corporal James Cook stating that employees "were told in training anytime there's a signal seven that's an officer needs [sic] help and that could be you one of these days, so you respond to assist"); DE 258 at 131 (Sergeant Regina Powell stating that if she was eating on her break and a tone

14

broke out, she would "get up off my break and make sure that [her] people [in Master Control] are letting the appropriate people in and out"); DE 252 at 129 (Corporal Bobbi Bartlett stating that if an employee is in the ODR, regardless of what unit they are assigned to, if a tone goes off "you are supposed to respond"); DE 256 at 77 (Corporal Brittany Barker responded to Signal 7 while in the ODR); DE 292 at 59 (Sergeant Whitney Hines would respond to combative inmate on her meal break); DE 293 at 78 (Corporal Karen Stormbringer understood from training that she was required to respond to all codes); DE 60 at 146 (Corporal Janet Vannatta testifying that officers were "required to respond" to tones)).

The plaintiffs also perform a variety of tasks during their meal breaks, including carrying radios and responding to radio calls (*see, e.g.,* DE 296 at 106 (Corporal Clarence Rankin would pick up a radio when he went on break in case a tone was called); DE 200 at 120 (Lieutenant Antonio Deleon testifying that custody officers must respond to radio or pages while on break); DE 287 at 39 (Sergeant Winifred Coles stating that custody commanders have radios at all times); DE 271 at 74 (Officer Monty Corbett would respond to radio or overhead pages while on break); DE 294 at 19 (Corporal Thomas Tuttle has radio with him when in the ODR and smoke room); DE 289 at 57 (Corporal Janet Duncan responded to radio calls)); responding to telephone calls (*see, e.g.,* DE 256 at 77 (Barker answered the telephone in the ODR and testified that commanders would call the ODR phone asking for certain officers); DE 254 at 18 (Sergeant John Reams answered

15

telephone calls in intake while on meal break); DE 288 at 30 (Cook performed regular duties while on meal break including answering and handling general master control duties); DE 292 at 57 (Hines would answer the phone during her meal break)); translating (*see* DE 284 at 36 (Blair called to translate for Hispanic inmates during meal break)); signing break sheets (*see, e.g.,* DE 195 at 162 (Kammer stating that break begins when the employee is relieved from their post and not when they reach the break sheet to sign out); DE 256 at 33 (Barker stating that amount of time to reach break sheet depended on where you were located in the facility); DE 288 at 48 (break time includes time spent traveling to the ODR to sign the break sheet); DE 286 at 24 (Corporal Joanna Cason signing break sheet at ODR); DE 269 at 133 (Corporal Tammy Vinegar-Ford stating she was instructed that she would be written up if she did not sign the break sheet); DE 289 at 31(Corporal Janet Duncan stating that when she brought her lunch she still needed to walk to the ODR to sign the break sheet)); transporting supplies (*see, e.g.,* DE 289 at 75 (Duncan transported razors, cleaning supplies, and jumpsuits while on her meal break); DE 295 at 71 (Corporal Charlotte Trotter transported razors, cleaning supplies, transport jumpsuits, and hygiene packs); DE 226 at 63 (Corporal Barry Lindsay picked up jumpsuits and care packs during his meal break); DE 256 at 14 (Barker returned razors, picked up cleaning supplies for the unit, and brought mail to the unit); DE 287 at 75 (Coles transported cleaning supplies); DE 294 at 72-73 (Tuttle obtained coffee for trustees, transported mail, razors, cleaning supplies,

16

jumpsuits, hygiene packs, clippers, underclothes, sheets, toilet paper, and took out trash); DE 268 at 61 (Officer Eva Hood retrieved razors during her meal break); DE 223 at 199 (Hughes delivered razors)); and escorting people (*see, e.g.,* DE 273 at 18 (Corporal Justin Dee would sometimes escort inmates during the meal break); DE 294 at 73 (escorted inmates and attorneys); DE 292 at 58 (Hines escorted inmates).[6]   While every plaintiff does not perform each of the above tasks, it is evident that they all share the common claim that they did not receive a bona fide meal break.

   While looking at the first factor in the decertification analysis, a court also

---

[6]The defendant notes that many of the above tasks performed by plaintiffs during their meal breaks are voluntary. *See, e.g.,* Operational Order 8.1.1 (stating "other officers who are not currently involved in the direct custody or supervision of inmates may respond, if available" to a Signal 7); DE 284 at 80 (Blair stating that Intake officers were not required to respond to tones in the housing unit, but they still responded sometimes); DE 250 (Officer Bill DeWitt stating duties not required to be performed on meal break); DE 268 at 56, 79 (Hood stating that rovers have obligation to pick up supplies; not required to keep radio at all times); DE 226 (Lindsay stating that he was not specifically instructed to get supplies); DE 258 at 25, 113 (Powell stating that employees not required to eat at work station; not required to work during meal break, but stating she needed to in order to complete her work); DE 213 (Master Control employees not required to carry a radio but can be reached by phone); DE 203 at 47 (Captain Robert Simpson stating that officers do not necessarily have to respond to medical emergency).  Whether the plaintiffs are required to perform such tasks, or whether they are the responsibility of other employees, are issues to be addressed at trial.  The plaintiffs have demonstrated that they are similarly situated because they engage in some activity during their meal break.  A fact finder may conclude that while the plaintiffs are not required to perform such tasks, there may be an expectation or unwritten policy that such work be performed. *See Hill v. Muscogee County School Dist.,* 2005 WL 3526669 (M.D. Ga. 2005 2005) ("if the decision makers all employ the same practice to deny overtime compensation, one justifiable inference which arises is that the pattern of violations was not coincidental but resulted from the application of a central policy").

"assesses the opt-in plaintiffs' job duties, geographic location, supervision, and salary." *Moss,* 201 F.R.D. at 409 (citing *Thiessen,* 996 F.Supp. at 1081).   The defendant refutes the existence of any impermissible policy and notes that the plaintiffs' claims rest on disparate factual situations.   In order to prove the meal breaks are compensable under the predominant benefit test, the plaintiffs must establish that the time they spend on any given meal break is predominantly for the benefit of the LFUCG.   The defendant argues that the determination of whether the meal break was missed or interrupted, whether the meal break was frequently interrupted[7] and how long an interruption lasted, whether work was performed on a meal break, and whether any work was minor varies from plaintiff to plaintiff, from shift to shift, from bureau to bureau, and from commander to commander; thus, the defendant urges, the varying factual allegations concerning the alleged interrupted and missed meal breaks will require individualized proof.[8]   *See* DE 72 at

---

[7] *See, e.g.,* DE 290 at 24 (Corporal Theresa Franklin testifying that frequency of tones has decreased over the years); DE 272 Exhibit 8 (analysis of frequency of tones demonstrated, on average, a Code 100 occurred every 1.8 days, a Code 101 occurred once every 5.8 days, and a Signal 7 occurred once every 1.6 days).

[8]The defendant is also concerned that members of "Subclass A" have testified adversely to other members of the subclass.  *See, e.g.,*  DE 68 at 134 (Sergeant Justin Crawford testifying that as a supervisor he has directed an employee to perform work during his meal break); DE 229 at 52 (Cunningham testifying she instructed an employee to perform work on break); DE 72 at 43 (Herbel testifying that Captain Mitchell directed her to sign out for a break she did not take); DE 195 at 192 (Lieutenants, Captains, and Majors do not sign break sheets); DE 250 at 55 (DeWitt stating he took longer than 20 minutes for meal break when he had to get supplies or respond to tone); DE 225 at 15 (Corporal Sarah Balltrip testifying that third shift Master Control may receive an extra break). While this may be examined during trial, this "conflict" does not justify

18

41, 47, 80 (Corporal Jessica Herbel stating that the interruptions differ depending upon the shift and division; stating some commanders would help employees get their breaks, whereas other commanders left that responsibility to the employee).

The plaintiffs acknowledge that their individual employment experiences are not identical; however, "plaintiffs must only be similarly – not identically – situated to proceed collectively." *Falcon v. Starbucks Corp.,* 2008 WL 155313, *4 (S.D. Tex. 2008); *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 2008 WL 2262076, *14 (W.D. Wis. 2008) ("If one zooms in close enough on anything, differences will abound") (citing *Frank v. Gold'n Plump Poultry, Inc.*, 2007 WL 2780504)). The court finds that differences among the practices of supervisors, the frequency of interruptions during breaks, the differences among bureaus and shifts, do not render collective treatment inappropriate, in light of the fact that other courts have certified meal break collective actions which undoubtedly involved the same issues of whether breaks were for the predominant benefit of the employer. *See Berger v. Cleveland Clinic Foundation,* 2007 W.L. 2902907 (N.D. Ohio 2007) (denying motion to decertify meal break claim where plaintiffs had presented substantial evidence of central policy binding the class together on the issue of whether the lunch breaks were predominately for the employer's benefit

---

decertification. *See Mendez v. Radec Corp.,* 232 F.R.D. 78, 84 (W.D.N.Y. 2005) ("even if [the class member] told the employees under his supervision not to report certain time . . . [he] would simply have been passing along directives – which he was also subject to – that he had received from above. . . . [and] like other . . . employees, simply did what he was told by his superiors.").

19

and whether the employer's policy allowed employees to record interrupted lunches or only missed lunches); *Jordan v. IBP, Inc.,* 542 F. Supp. 2d 790 (M.D. Tenn. 2008) (decertification denied where there was common question of whether the employees were required to perform production and non-production work during their meal break).  Further, the court finds the variations do not foreclose collective adjudication, as the "plaintiffs have amply shown that they were subject to a common practice or scheme that violated the law.  Thus, the . . . issues related to potential disparate factual and employment settings do not defeat plaintiffs' valid basis for moving forward with collective action."  *Torres v. Gristede's Operating Corp.*, 2006 WL 2819730, *10 (S.D.N.Y. 2006); *see also Moss,* 201 F.R.D. at 410 (despite differences in job duties, geographic assignments, and hourly billing rates, each plaintiff was similarly situated as they were subjected to common practice of not receiving overtime wages).

In *Falcon v. Starbucks Corp.,* 355 opt-in plaintiffs, employed by Starbucks as assistant store managers at different stores in 30 states under the supervision of different individuals, alleged that they worked in excess of forty hours per week. 2008 WL 155313, *4, 6 (S.D. Tex. 2008).  Although the defendants presented some testimony that certain managers ensured that the assistant managers did not work off-the-clock, the *Falcon* court held that "an employer should not be allowed to escape class liability simply because some managers do not commit FLSA violations as long [as] the evidence shows that there is a factual or legal nexus that

20

binds together the claims of the opt-in plaintiffs before the court." *Id.* at *6.

Further, the Falcon court found that although the plaintiffs did not perform *exactly*

the *same duties* off-the-clock, that did not undermine the conclusion that the

putative class was similarly situated, as all the plaintiffs alleged they were not

compensated for duties they performed over 40 hours.  *Id.* at *7 (emphasis added).

In *Kasten v. Saint-Gobain Performance Plastics Corp.* the court found that

> [a]lthough the amount of time and gear varies among plaintiffs, the variations do not negate the existence of a practice of not compensating employees for donning, doffing and walking . . . . Regardless whether plaintiffs work in different areas, on different shifts and don and doff different amounts of required protective gear, they were subject to defendant's general practice of not compensating employees for donning and doffing certain protective gear and walking to work areas, in violation of the FLSA. . . . those variations do not change [the court's] conclusion that plaintiffs are similarly situated in regards to their FLSA claims.

2008 WL 2262076, *13-14 (W.D. Wis. 2008).

Similarly, in this case, while the plaintiffs are under the direction of different

commanders and work in different shifts and bureaus, they have presented

substantial evidence supporting their contention that the defendant's *de facto*

policies and practices deprived them of a bona fide meal period.  The court

therefore finds that "there is a meaningful nexus that binds plaintiffs' claims

together and that the similarities in their claims outweigh their differences," and

that they have demonstrated they are similarly situated.  *Falcon,* 2008 WL

155313, *9; *see also Hill*, 2005 WL 3526669, *3 ("if there is sufficient evidence

of an employer's pattern of subjecting employees to the same improper practice,

21

that would be sufficient to warrant a finding of similarity justifying collective adjudication.").

### B.  Individualized Defenses

The second factor raises the issue of whether the potential defenses pertain to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual plaintiff.  "Because individualized defenses prevent an efficient proceeding with a representative class, several courts have granted motions for decertification on this basis.  However, the district court has the discretion to determine whether the potential defenses would make the class unmanageable."  *Moss,* 201 F.R.D. at 410 (citations omitted).

The defendant maintains that it has established particularized defenses to each plaintiff's meal break claim, such that it must confront them all individually. The court is not convinced that the defendant's defenses are so individualized that collective adjudication of the meal break claim is unworkable, as many of the defenses are uniform and suitable for assertion against each plaintiff who testifies at trial.  For instance, the issues of whether the plaintiffs could and did resume their breaks, whether they voluntary performed tasks during their break, the length of time spent performing work on breaks, and whether they took excessive breaks all relate to the common claim of whether the plaintiffs received the breaks to which they were entitled.  Additionally, contradictions in testimony among the plaintiffs "are matters of credibility for the factfinder, not individualized defenses."

22

*Pendlebury v. Starbucks Coffee Co.,* 518 F. Supp. 2d 1345, 1362 (S.D. Fla. 2007) (Court discussing contradictions between duties plaintiff lists on resume versus what he testified to during his deposition); *see, e.g.,* DE 250 at 37 (DeWitt stating he did not resume breaks); DE 286 at 18 (Cason allowed to resume break if interrupted by tone); DE 70 at 73 (Johnson stating that he would attempt to resume his break after responding to a tone).

The defendant next asserts that the plaintiffs' failure to request payment for missed meal breaks by recording it on their time cards estops them from recovering under the FLSA, as they are responsible for recording their own time.  *See, e.g.,* DE 59 (Corporal Janet Vannata testifying it is her responsibility to fill out the time card); DE 256 at 28 (Barker testifying that it was her responsibility to fill out the time card correctly); DE 290 at 29 (Franklin testifying that it is her responsibility to fill out a time card, however, "if you've got overtime on there and it hasn't been approved, they take it off"); *but see* DE 250 at 38 (DeWitt stating he was never told by a supervisor not to report all the time on his time card).  Thus, the defendant maintains, whether it was aware of the work and whether the employee failed to record the work on his or her time card are individualized issues. On the contrary, this defense "will not be a particular defense raised against a specific plaintiff; rather it will be asserted against every member of the class."  *Moss,* 201 F.R.D. at 411; *see also Falcon,* 2008 WL 155313, *9 (whether defendant had actual or constructive knowledge of any off-the-clock work or whether those tasks

23

were *de minimis* were defenses that could be adequately raised at a trial involving representative testimony).  Decertification would require the same analysis of whether the plaintiff was required to record his time in over 300 separate lawsuits, which would be an inefficient way of resolving this issue.  Similarly, the defendant's *de minimis* defense "raises legal questions susceptible of class-wide resolution."  *Frank v. Gold'n Plump Poultry, Inc.*, 2007 WL 2780504, *4 (D. Minn. 2007).

The defendant also argues that in order to establish liability under the FLSA, the plaintiffs will have to establish not only that the meal breaks are compensable, but that they worked overtime in a particular week. The defendant argues that if the plaintiffs are entitled to damages, they are entitled only to damages if unpaid compensable time worked during meal breaks puts them into an overtime status. Because the issues of liability and damages have been bifurcated (DE 114), this issue should not preclude collective adjudication of the central issue of whether there was a policy of denying bona fide meal periods which resulted in uncompensated work. *See Berger v. Cleveland Clinic Foundation,* 2007 WL 2902907, *22 (N.D. Ohio 2007) ("While each class member may have individualized damages, the court finds that the main inquiry is common to all, namely, what the [defendant's] policy was regarding interrupted lunches.").

Finally, the defendant argues that certain class representatives are subject to the individualized defense that they lack standing to pursue their claims based on

24

bankruptcy filings.  "Causes of action belonging to the debtor prior to bankruptcy constitute estate property."  *In re RCS Engineered Products Co, Inc.,* 102 F.3d 223, 225 (6th Cir. 1996).  While the court does not reach the merits of the bankruptcy standing issue, it notes that "lack of standing due to bankruptcy filings would not require individualized proof at trial" because "the effect of the bankruptcy filings of [the plaintiffs] is a legal question for the court."  *Smith v. Micron Electronics, Inc.,* 2005 WL 5336571, * 3 n.6 (D. Idaho 2005).  Further, "the original plaintiffs are no longer representing the additional plaintiffs; they are all plaintiffs" as they have "affirmatively opted in as plaintiffs in this case, and they are full parties for all purposes."  *Coan v. Nightingale Home Healthcare, Inc.,* 2006 WL 1994772, *2 (S.D. Ind. 2006).

After considering the defenses that will be asserted in this case, the court finds that each of those defenses could be addressed in a collective forum, "where the defendant will be free to present evidence of its lawful employment policies and practices, to cross-examine individual representative plaintiffs, and to call to the stand others with material testimony that helps the defendant's case."  *Wilks,* 2006 WL 2821700, *7; *see also Jordan,* 542 F. Supp. 2d at 813-14 ("The defenses here are amenable to collective resolution in that the defendants will have ample opportunity to demonstrate that they do not employ a policy or practice which has the effect of denying plaintiffs compensation to which they are entitled under FLSA and may cross-examine the representative plaintiffs and adduce other

25

testimony that supports their position.").

### C.  Fairness and Procedural Considerations

In analyzing the third factor, the court must "consider that the primary objectives of a § 216(b) collective action are: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Moss v. Crawford & Co.,* 201 F.R.D. 398, 410 (W.D. Pa. 2000) (citing *Hoffman-LaRoche, Inc. v. Sperling,* 493 U.S. 165, 170 (1989)).  In addition, the court must determine whether it can manage the class in a manner that does not cause prejudice to any party.  *Id.*  When Congress enacted the FLSA, it intended it to be broadly remedial and humanitarian.  *Dunlop v. Carriage Carpet Co.,* 548 F.2d 139 (6th Cir. 1997).  While "the remedial nature of the FLSA, standing alone, does not justify allowing a case to proceed collectively, it does at least suggest that a close call as to whether plaintiffs are similarly situated should be resolved in favor of certification." *Falcon,* 2008 WL 155313, *10.

While arguing that presenting proof regarding the different classifications, bureaus, and commanders to the jury on a collective basis will necessarily result in prejudice and confusion, the defendant has failed to present any argument of merit which convinces the court that it will not be able to manage the trial in a manner that will not prejudice any party.  Although there are some differences among the shifts, bureaus, and ranks, the weight of authority and the preservation of judicial

26

resources favor collective adjudication in light of the common policy or practice at the DCC of the plaintiffs allegedly not receiving a bona fide meal period. Decertifiying this action would be contrary to the primary objectives of § 216(b). Here the plaintiffs have met their burden and demonstrated that they are similarly situated in order to benefit from the advantages of a collective action.  Not only would decertification place each plaintiff back at square one without the benefit of pooled resources, but also the court would be required to consider the same common question of whether the defendant had a *de facto* policy or practice of denying the plaintiffs a bona fide meal period.  *See Wilks,* 2006 WL 2821700, *8 ("Because the plaintiffs' assertions about the defendant's purportedly improper time-keeping and pay practices play a predominant role in each of their claims, any requirement that each plaintiff prove his or her claims individually would waste more judicial time and resources than trying their cases individually would preserve.").  "Such a result is antithetical to the policy behind collective actions under § 216(b) of the FLSA: allowing plaintiffs to vindicate their rights by efficient resolution in one proceeding of common issues of law and fact arising from the same improper practice."  *Kautsch v. Premier Communcations,* 2008 WL 294371, *4 (W.D. Mo. 2008) (stating "[e]ven where factors (1) and (2) weigh in favor of decertification of a provisionally certified class, the district court must balance those factors with the fundamental purposes of 29 U.S.C. § 216(b)").  The fairness and procedural considerations militate toward proceeding collectively in this case.

27

IV.    **CONCLUSION**

Accordingly,

**IT IS ORDERED** that the defendant's motion to decertify "Subclass A" (DE 319) is **DENIED**.

**IT IS FURTHER ORDERED** that the defendant's motion to decertify "Subclass B" and "Subclass C" (DE 318) is **GRANTED.**

Signed on  July 22, 2008

*Jennifer B. Coffman*
JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCY

28