ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON
CIVIL ACTION NO. 5:06-CV-00299-JBC


JUSTIN CRAWFORD, et al                                                    PLAINTIFFS


**MEMORANDUM IN SUPPORT OF**
**MOTION FOR ATTORNEYS' FEES**
v.                          **AND FOR APPROVAL OF ALLOCATION**
**OF PROCEEDS OF SETTLEMENT**


LEXINGTON-FAYETTE URBAN
COUNTY GOVERNMENT                                                    DEFENDANT


* * * * *


Comes Miller, Griffin & Marks, P.S.C. ("MGM") and for their Memorandum in support of

their Motion for the proposed allocation of settlement proceeds, and for an award of MGM's

attorneys' fees and costs in the amounts of $870,000 from the Lexington-Fayette Urban County

Government ("LFUCG") and $274,537 from the Plaintiffs.  In support of their Motion, MGM states

as follows:

## BACKGROUND

As an initial matter, MGM notes that this Memorandum is filed as part of the parties' attempt

to settle this action.  In the event the settlement is not approved, nothing in this Memorandum should

be considered to operate as any sort of admission or waiver as to the Plaintiffs' claims in this action.

**A.      The Initiation of the Action**

Justin Crawford ("Crawford") and his wife, Michelle, contacted MGM with a complaint about his employment conditions at the Department of Community Corrections ("DCC") of the LFUCG.  Specifically, he was given inadequate time for a meal and was consistently engaged in duties for the benefit of his employer during a majority of his scheduled breaks.  Crawford explained that most other DCC uniformed Employees ("Employees") were in similar situations.  He further explained that many of these Employees were also engaged in duties both before and after their shift times, for which no wages were being paid.

After preliminary research and investigation, MGM determined there might be supportable claims for violation of state and federal wage and hour laws.  Thereafter, MGM attorneys met with nine (9) current Employees of the DCC who provided substantially more detail about the interruptions they experienced during their purported breaks and about the additional uncompensated time they regularly worked after (and sometimes before) their shifts.  Those nine (9) Employees became the original Plaintiffs in the Complaint filed by MGM.

The initial Complaint was filed in the Fayette Circuit Court on September 6, 2006, and sought certification of a class of all similarly situated DCC employees.  (D.E. 1).  The Complaint asserted widespread and multiple violations of the Fair Labor Standards Act ("FLSA") and the Kentucky Wage and Hour Act.  Accordingly, the Plaintiffs sought certification as a collective action under 29 U.S.C. § 216(b) (as to their FLSA claims) and a class action under Rule 23 (as to their state law claims).  At the time of the filing of the original Complaint, it was impossible to determine whether the certification would be granted and whether any additional Employees would participate in this action as Plaintiffs.

**B.    The Procedural Progression of the Action**

On January 10, 2007, the Court dismissed the Plaintiffs' state law claims pursuant to the doctrine of sovereign immunity, leaving only the claims asserted under the FLSA.  (D.E. 85).  On January 26, 2007, the Court conditionally certified the Plaintiffs' FLSA claims as a collective action under 29 U.S.C. § 216(b).  The Court approved a Notice and Consent form to be sent to each potential Plaintiff.  (March 12, 2007, Order, D.E. 107).

On May 28, 2008, the Court granted conditional certification to three Subclasses: Subclass A, comprised of Plaintiffs who had been assigned to Custody, Intake, and Master Control, and which would assert a claim that meal breaks in those three Bureaus were not bona fide; Subclass B, comprised of Plaintiffs who had been ranked as Lieutenants, and which would assert a claim that they had been misclassified by the LFUCG as "exempt" from the FLSA; and Subclass C, comprised of Plaintiffs who had been ranked as Captains, and which would assert a claim that they had been misclassified by the LFUCG as "exempt" from the FLSA.  (D.E. 311).  Upon the LFUCG's Motion, and the Plaintiffs' Response stating that they had no objection, Subclasses B and C were later decertified, although the Court scheduled the exemption claims asserted by the Lieutenants and Captains to be adjudicated during one trial.  (D.E. 327).  On July 22, 2008, the Court denied the LFUCG's Motion to Decertify Subclass A.  (D.E. 338).  The "meal break" claim asserted by Subclass A was scheduled to be tried immediately following the trial of the Lieutenants' and Captains' exemption claims.  The claims asserted by the Plaintiffs (including claims for off-the-clock work other than during meal breaks, meal break claims asserted by Employees outside of Custody, Intake, and Master Control, and the exemption claim of Mickey Pitts, a retired Major) were all held in abeyance by the Court.

The parties filed cross-Motions for Partial Summary Judgment regarding the exemption claims; those Motions were denied by the Court on June 25, 2008. (D.E. 325). Additionally, the Plaintiffs filed a Motion for Partial Summary Judgment regarding the compensability of meal breaks in the Custody, Intake, and Master Control Bureaus; the Court denied that Motion on June 25, 2008. (D.E. 325).

**C.      The Mediation**

Prior to the mediation which resulted in the proposed settlement, all Plaintiffs who had provided MGM with e-mail addresses were notified by e-mail of the tentative date for the mediation. (Affidavit of Lynette Mayo, attached as Exhibit 1). That communication also invited the Plaintiffs to attend at least one of several scheduled meetings to assist counsel in preparing for trial and mediation and to explain the mediation process to the clients. Each recipient was asked to circulate the information to other Plaintiffs in order to ensure that those Plaintiffs without e-mail would be aware of the mediation. Those meetings, conducted by the Plaintiffs' counsel, were held on July 22 and 28, 2008, at MGM's offices. On August 1, 2008, and again on August 6, 2008, the Plaintiffs were notified of changes in the mediation dates. A final notice of mediation was sent by e-mail on August 15, 2008. That communication notified the Plaintiffs that the mediation was scheduled for August 21 and 22, 2008. (See Exhibit 1).

On August 21 and 22, 2008, and by agreement, the parties mediated this dispute before Hunter Hughes in Lexington, Kentucky. The two mediation sessions lasted a total of 13 hours. In addition to the Plaintiffs' counsel, the mediation sessions were attended by eight (8) representative Plaintiffs. Five (5) of those Plaintiffs were also original named Plaintiffs who, as explained below, had been expressly recognized by opt-in Plaintiffs as having authority to settle the asserted claims. The Plaintiffs who participated in mediation received detailed analyses of the claims asserted, the

4

attorneys' belief as to the probabilities of success on each of those claims, and potential damages calculations.

**D.    Preliminary Efforts to Notify the Plaintiffs of the Proposed Settlement and Allocation, and Objections Received to Date**

At the conclusion of the mediation, the parties' counsel signed a Term Sheet which settled most matters in dispute. The Term Sheet, as well as an explanation of it, was sent to all Plaintiffs for whom MGM had been provided e-mail addresses on August 22, 2008. (See Exhibit 2).

After the mediation, Plaintiffs' counsel notified the Plaintiffs that they would make themselves available for meetings at the DCC Facility on two (2) consecutive days in order to explain the proposed settlement and allocation, as well as to answer any questions. The LFUCG permitted Plaintiffs who are not currently employed at the DCC to have access to the Facility for purposes of attending the meetings. By beginning fifty-five (55) minutes prior to the beginning of a shift and ending forty-five (45) minutes after the end of a previous shift, these meetings were designed to be accessible to as many Plaintiffs as possible. At those meetings, which were led by one or more of Plaintiffs' counsel, the Term Sheet and a very detailed written explanation of the proposed allocation was distributed to attending Plaintiffs. Among the comments received by the Plaintiffs' counsel at these meetings were:

- Several Plaintiffs assigned to the Auxiliary Services, CAP, and Programs Bureaus maintained that they regularly worked shifts lasting from eight (8) hours and five (5) minutes to eight (8) hours and twenty (20) minutes without a paid meal break. They also regularly worked a primary and/or secondary overtime shift in Custody. These individuals believed that they should receive the same allocation proposed to be

made to Plaintiffs who had missed meal breaks.  The Plaintiffs' counsel considered those comments and revised the proposed allocation in the manner explained below.

• Some objections were made to the amount of attorneys' fees requested by MGM. The Plaintiffs' counsel has assured these Plaintiffs that they will have an opportunity to make objections with the Court as to those fees.

## THE PROPOSED ALLOCATION

**A.    The Proposed Allocation Has Been Approved by the Representative Plaintiffs**

The nine (9) original Plaintiffs and Plaintiffs' counsel propose an allocation of the proceeds which, upon approval from the Court, will be received from the LFUCG in settlement of the claims made in this proceeding.  The representative Plaintiffs and Plaintiffs' counsel preliminarily note that the Notice of Collective Action and Consent to Sue Form ("Notice"), which was approved by the Court and sent to all parties who ultimately opted-in to this action (attached as Exhibit 3), designates the nine (9) representative Plaintiffs to make decisions on behalf of all participants concerning the litigation, specifically including any settlement agreement that might be reached with the LFUCG (subject to the Court's finding that the settlement is reasonable).[1]  As evidenced by the Consent to Proposed Settlement attached hereto as Exhibit 4, the nine (9) representative Plaintiffs have reviewed the Settlement Agreement Term Sheet and the proposed allocation of settlement proceeds (with exhibits), and have approved the terms of the settlement, the proposed allocation of proceeds, and the proposed payment of attorneys' fees.

---

[1]  The relevant language in the Notice and Consent concerning the authority of the representative Plaintiffs to agree to settle the action, as well as the fee agreement entered by MGM, is set forth below in the portion of this Memorandum which addresses Plaintiffs' counsel's Motion for an award of attorneys' fees.

**B.    General Terms of the Proposed Settlement**

As set forth above, the total value of the settlement is $1,150,000 to be allocated to the Plaintiffs, plus $870,000 to be paid by LFUCG to MGM. Of the $1,150,000 sum, $805,000 will be paid in cash; of that cash payment, $402,500 will be paid by January 31, 2009, and $402,500 will be paid by July 31, 2009. The remaining $345,000 of the $1,150,000 sum is represented by paid "leave time". Plaintiffs who are current Employees will receive both cash and leave time. If approved by the Court, $268,000 in attorneys' fees pursuant to the terms of employment (explained below), and $6,537.25 (representing 50% of the mediator's fees), will be deducted from the amount of cash available for distribution to the Plaintiffs. The Plaintiffs' counsel propose that the attorneys' fees and expenses be paid from the July 2009 receipts, leaving a total of $524,362.75 in cash to distribute to the Plaintiffs.

The leave time valuation includes the salary, FICA obligations and pension benefits that will be paid by LFUCG if the leave time is cashed in at the termination of employment, or represents the assumed cost of a replacement when leave time is used. Leave time is similar to vacation time because it will be paid upon termination of employment. Unlike the compensatory time awarded to Lieutenants, Captains and Majors, therefore, this leave time will not be lost when employment is terminated. The LFUCG has committed to creating this new category of "time off" and will track its allocation to, and use by, Plaintiffs who are current Employees.

Those Plaintiffs who are no longer employed by the DCC are obviously unable to use any of the leave time, so they must receive cash for their portion of the settlement. Because the leave time does not promptly (if ever) convert to cash, those who are currently employed will be receiving a disproportionately lower portion of the cash proceeds.

7

The allocations proposed by Plaintiffs' counsel are explained in detail below. For the Court's convenience, a chart of those allocations is attached hereto as Exhibit 5. A detailed spreadsheet outlining the proposed allocation to each individual Plaintiff is attached hereto as Exhibit 6.

**C.      Proposed Allocation to Plaintiffs with Exemption Claims**

As the Court is aware, the LFUCG classifies DCC Employees ranked as Lieutenants, Captains, and Majors as exempt from the FLSA's overtime pay requirements. The Plaintiffs challenged that classification on behalf of eleven (11) Plaintiffs, six (6) of whom remain employed at the DCC. In lieu of overtime pay for overtime worked, these Plaintiffs received "compensatory time" on an hour-for-hour basis. On June 25, 2008, the Court denied the parties' cross-Motions for Partial Summary Judgment regarding the exempt classification, and found that a genuine issue of material fact existed as to whether these Plaintiffs' primary duty was management or the detention and supervision of suspected and convicted criminals. (D.E. 325).

Relying on the LFUCG's time records, the Plaintiffs' counsel determined the total number of compensatory time hours banked by the eleven (11) affected Plaintiffs from September 6, 2003, through the present. That banked time represents the total number of hours for which these Plaintiffs should have received a cash payment at an overtime rate.

As the Court will recall from the parties' cross-Motions for Partial Summary Judgment, the Plaintiffs' challenge to this exempt classification relied heavily upon 29 C.F.R. § 541.3(b)(1), the "first responder" regulation enacted by the United States Department of Labor. That regulation was not effective until August 23, 2004. However, the LFUCG argued that these Plaintiffs could not be deemed to have been misclassified any later than July 1, 2007, when a Collective Bargaining Agreement ("CBA") between the Plaintiffs (and all other DCC Lieutenants and Captains) and the LFUCG became effective. Under the CBA, the Plaintiffs agreed to receive 1 hour of compensatory

8

time for each hour worked in excess of forty (40) hours per week. Plaintiffs' counsel thus considered the exemption claim to have value only from August 2004 through July 1, 2007.

Additionally, the LFUCG argued that many - if not most - of the banked compensatory time awarded to these Plaintiffs had been used by them. The LFUCG therefore contended that, even if the Plaintiffs should have received 1.5 hours for each hour of overtime worked, they had already received the benefit of one hour's worth of time for each overtime hour, so that the LFUCG could not be liable for damages based on more than 0.5 hours for each overtime hour worked. In settling this claim, the Plaintiffs confronted this possible limitation on the LFUCG's damages, as well as the risk that a jury would find that the primary duty of one or more of these Plaintiffs was management rather than supervision and detention of inmates. The total number of compensatory hours banked by these Plaintiffs from August 1, 2004, through July 1, 2007 (the effective date of the CBA), is 1,170.40.

In light of the above factors, and the strengths and weaknesses of the exemption claims as set out in the parties cross-Motions for Partial Summary Judgment on this matter, the Plaintiffs' counsel propose that each of the Plaintiffs with an exemption claim receive $1,000 each, or, a total of $11,000.

**D.    Proposed Allocation to Plaintiffs with Meal Break Claims**

1.    Custody, Intake, and Master Control

Based upon the parties' extensive discovery and the LFUCG's representations, the Plaintiffs' counsel believe that the Custody, Intake, and Master Control Bureaus are the only areas of the DCC with a regular schedule of 8 hours and twenty (20) minutes. Employees in these Bureaus are paid for only eight (8) hours per shift due to the daily twenty-minute unpaid "meal breaks" that these Employees are supposed to receive.

9

On May 28, 2008, the Court conditionally certified a Subclass comprised of Plaintiffs who, from September 2003 through the present, have worked in the Custody, Intake, and Master Control Bureaus. This Subclass was conditionally (and, on July 22, 2008, finally) certified as a collective claim, which meant that, even if some differences existed in the strength of these individual Plaintiffs' meal break claims, all members of this Subclass would prevail or lose as a group at trial. On June 25, 2008, the Court denied the Plaintiffs' Motion for Partial Summary Judgment regarding the compensability of these Plaintiffs' meal breaks, finding a jury question as to whether the Plaintiffs spent their meal breaks for the predominant benefit of the LFUCG. In addition to claiming that these Plaintiffs' meal breaks were not spent for the predominant benefit of the LFUCG, the LFUCG also asserted a defense to this claim (and all other FLSA claims) under the partial exemption of 29 U.S.C. § 207(k). Had the Court agreed with the LFUCG that it had adopted a qualifying workweek plan under § 207(k), then the Plaintiffs would not have been able to recover any damages under the FLSA except for those weeks in which they could establish that they had worked more than forty-three (43) hours (rather than forty (40) hours) without overtime compensation.

Because the meal break claim was to be tried collectively, and because the Plaintiffs' counsel consistently based the meal break claim on the LFUCG's (largely admitted) policies and practices, Plaintiffs' counsel has not attempted to individually quantify the value of the meal break claims according to an individual Plaintiff's Bureau, shift, rank, work station, or personal experience. Instead, the proposed allocation for the meal break claims is based exclusively on the Bureau in which, beginning September 6, 2003, each Plaintiff worked and the number of years each Plaintiff has been employed at the DCC.

In light of the foregoing, and based upon the strengths and weaknesses of the meal break claim as set forth in the briefing of the Plaintiffs' Motion for Partial Summary Judgment concerning

the compensability of meal breaks, the Plaintiffs' counsel propose that an allocation of $700 per full year worked (with prorations for partial years worked) be made to all Employees whose regular work assignments were to the Custody, Intake, or Master Control Bureaus and who (for the reasons explained below) completed Interrogatory answers.

      2.    <u>Auxiliary Services, CAP, and Programs Bureaus</u>

Plaintiffs' counsel find themselves in a quandary as to the appropriate allocation of proceeds to Employees in the Auxiliary Services, CAP, and the Programs Bureau as to the "meal break" claim. Sworn testimony by the DCC's Director of Operations reflects that the scheduled shift for these Bureaus is eight (8) hours and five (5) minutes, and that these Employees are paid for their "meal break" time. (*See* Deposition of James Kammer, pp. 107: 4-10; 110: 9-16; 169:13-21). Unfortunately, and in contrast with the Custody, Master Control, and Intake Bureaus, no Operational Order or other documentation confirms the meal break policy as to these Bureaus. Subsequent to mediation, Plaintiffs' counsel met with numerous Plaintiffs who have worked or now work in Auxiliary Services, CAP, or Programs. Some of these Plaintiffs insist that they have regularly worked up to eight (8) hours and twenty (20) minutes per day but are paid for only eight (8) hours.[2]

---

[2]The disparity among the testimony regarding the Auxiliary Services Bureau, in particular, is remarkable. Thomas Gibbs, the Major who oversees Auxiliary Services, stated that Auxiliary Services employees "come in at 6:55 and would get off at 3:15." (Deposition of Thomas Gibbs, p. 35: 7-9). He later testified, however:

    Q.    Okay. And what are [Auxiliary Services'] hours Monday through Friday?

    A.    **7:00 to 3:00. Come in at five till and leave at 15 after would be a required time**. However, auxiliary services . . . at 3:00 they've been known – we've let them go. It there's nothing to do, all the courts are taken care of, typically leave at 3:00.

11

These Plaintiffs also now claim that they often work mandatory or secondary overtime shifts in the Custody Bureau; during those shifts, obviously, they are subject to the same meal break policies challenged by Subclass A.

Due to the sharply conflicting testimony and statements made by those working in these three areas, and in the absence of any written or LFUCG-admitted policies concerning shift time and meal break rules (an absence which distinguishes the "meal break" claim asserted by Employees in Auxiliary Services, CAP, and Programs from the "meal break" claim asserted by Subclass A), and because of the representations of the Employees in these Bureaus that they regularly worked in Custody during their primary or secondary days, Plaintiffs' counsel propose that Plaintiffs who are or who have been assigned to Auxiliary Services, CAP, and Programs (and who signed interrogatory responses) receive a "meal break claim" allocation of $350 per year, or, 50% of the "meal break" allocation proposed for Employees in Custody, Intake, and Master Control.

**E.      Proposed Allocations to Plaintiffs for Other Unpaid Time Claims**

---

> Q.    How do their meal period – their 20-minute meal period work. **Is that the same as the intake officers, they get their 20-minute meal period but it's not paid.**
>
> A.    **Yes, sir**.
>
> Q.    **So if for some reason they were needed till 3:15, you could keep them till 3:15 and they would get paid for that eight-hour shift?**
>
> A.    **Yes, sir.**

*Id*. at p. 37, lines 1-17 (emphasis added).  Thus, the testimony of the Major in charge of Auxiliary Services is at odds with the testimony of the Director of Operations.  That conflict is an example of the inconsistencies in the testimony and demonstrates Plaintiffs' counsel's difficulty with respect to the meal break claims of this Bureau.

The Plaintiffs asserted claims for other amounts of time that they worked but for which they were not paid. These claims arose from the LFUCG's policy of requiring some Employees to begin hospital duty prior to the start of their shifts, or remaining late to sign an activity report (during the time period that was required), or waiting to learn whether mandatory overtime would be assigned, or reporting to work and remaining through a pre-shift briefing only to be sent home or simply not being timely relieved from duty.

The Plaintiffs confronted a substantial difficulty in quantifying the amount of this time for purposes of an eventual trial. Affected Employees typically completed time cards reflecting only eight (8) hours of work per shift, even if they performed some post-shift or pre-shift duties. Additionally, Plaintiffs' counsel were forced to acknowledge at mediation that the Court would likely find this time to be compensable only in workweeks in which a Plaintiff worked more than forty (40) hours (or, if the LFUCG established its § 207(k) defense, only in workweeks in which a Plaintiff worked 43 hours).

In light of the foregoing, the Plaintiffs' counsel propose an allocation of $200 per year worked (with prorations for partial years) to all Plaintiffs who completed interrogatory answers, representing compensation for unpaid time worked other than the meal breaks. This allocation is not proposed for those Plaintiffs who have held the ranks of Lieutenants, Captains, and Major over the past three years, because those Plaintiffs typically reported all additional time worked and received "compensatory time" in return.

**F.    Proposed Allocation to Plaintiffs with Retaliation Claims**

The Plaintiffs, and their counsel, believe that many of the Plaintiffs were treated badly by the DCC administration after and because the lawsuit was filed. However, Plaintiffs' counsel acknowledge that the retaliation claims asserted in this action would have required proof that the

administrator involved in the bad treatment of one or more individual Plaintiffs was primarily motivated by those individuals' participation in this lawsuit. Additionally, and with the exception of the retaliation claims asserted regarding the LFUCG's failure to promote Lieutenant Randy Jones and Sergeant Kevin Johnson, these retaliation claims did not involve readily-identifiable economic losses. On the other hand, Plaintiffs' counsel placed some value on these claims, whether or not they were ultimately successful, since the claims tended to show the disregard of certain administrators for the legal rights of the Employees.

The parties' Settlement Agreement does not purport to release any claims except those related to the FLSA and the Kentucky Wage and Hour Act, and so preserves the right of the Plaintiffs to assert claims for actions which they believe to be inappropriate and illegal but unrelated to their participation in this action. Plaintiffs' counsel propose a total allocation to the retaliation claims of $10,500, with individual allocations as follows:

1. <u>C&Cs</u>. The first retaliatory act alleged by the Plaintiffs occurred two weeks after the filing of the Complaint, when the LFUCG issued C&Cs to Employees who failed to sign the break sheet three times per day. Of the recipients of those C&Cs, only Janet Vannatta was a Plaintiff at that time. Plaintiffs' counsel therefore acknowledge that she would likely be the only Plaintiff with a viable retaliation claim in connection with the issuance of C&Cs. Although the C&C did not result in any specific economic damages to Vannatta, the incident prompted an extensive hearing before the Court, allowing Plaintiffs' counsel to elicit substantial testimony from the administration and others that was of great benefit in prosecuting this case. Plaintiffs' counsel therefore recommend an allocation of $1,000 to Vannatta for this retaliation claim.

14

2. <u>Lieutenant Antonio Deleon and Captain Geneva Mitchell</u>. These two Plaintiffs received disciplinary action which they, and the Plaintiffs' counsel, believe to have resulted from their participation in this action. However, and to date, that discipline has not resulted in any identifiable economic damage. Plaintiffs' counsel therefore recommend an allocation of $1,000 each to Lieutenant Deleon and Captain Mitchell for these claims.

3. <u>Lieutenant Jones and Sergeant Johnson</u>. These two Plaintiffs obviously lost wages due to the LFUCG's failure to promote them to the rank of Captain. On the other hand, Plaintiffs' counsel understand that new openings for the rank of Captain are anticipated in the near future. In the event these two Plaintiffs are again overlooked for promotion, and if they can establish that they are qualified for the promotion and that the basis for their non-selection was their participation in this action, they would have renewed claims for retaliation. Plaintiffs' counsel therefore recommend an allocation of $2,500 each to Lieutenant Jones and Sergeant Johnson.

4. <u>Corporal Eva Hood</u>. This Plaintiff suffered actions which she believes to have constituted retaliation against her for her participation in this lawsuit. Those actions are detailed in the Ninth Amended Complaint. (D.E. 163). In light of the disturbing nature of those actions, Plaintiffs' counsel recommend that she receive an allocation of $2,500 for her retaliation claim.

**G. Proposed Allocation to Certain Plaintiffs to Reflect Extraordinary Participation**

Plaintiffs' counsel propose that an additional allocation be made to the two below-described groups of Plaintiffs. At no time in the litigation, however, did Plaintiffs' counsel indicate or promise to either of the following two groups that they might receive some additional payment, either at trial

15

or through settlement, to reflect their work for and service to the larger group. Rather, these allocations are proposed only at the instance of Plaintiffs' counsel, and are not made at the request of any of the recipients.[3]

1. <u>Initial (Lead) Plaintiffs</u>. Although MGM has substantial experience in employment-related matters, and some experience in class actions, it had not previously been involved in litigation concerning correctional facility workers. Before agreeing to represent the Plaintiffs, therefore, Plaintiffs' counsel had to be educated about the operations of the DCC, the problems experienced by the Employees, and the written documents that might affect the rights of the parties. Counsel also wanted to ensure that this guidance would come from individuals who had a broad range of experience at the DCC (e.g., Employees assigned to different Bureaus and holding different ranks) and who would be representative of the larger group of prospective Plaintiffs. Plaintiffs' counsel believed that the existence of such a group was needed to maintain a collective action under 29 U.S.C. § 216(b), and was a precondition to seeking certification of a traditional class action under Fed. R. Civ. P. 23 as to the state law claims originally asserted in this action.

The original nine (9) Plaintiffs who filed this action took considerable time and effort to educate the Plaintiffs' counsel and to convince them to become involved in the representation. These nine (9) Plaintiffs were further willing to be identified by the DCC administration as potential

---

[3] Caselaw supports approval of settlements which award greater sums to named or lead Plaintiffs. *See Hopson v. Hanesbrands, Inc*., 2008 WL 3385452 (N.D. Cal. 2008) (in a total settlement of $400,000, the Court approved a $5,000 payment to the named plaintiff as an "incentive payment" based upon that plaintiff's extensive participation in the litigation); *Quintanilla v. A&R Demolition*, 2007 WL 5166849 (S.D. Tex. 2007) (approving settlement which allocated incentive awards and bonuses to 26 original named Plaintiffs); *Camp v. The Progressive Corp*., 2004 WL 2149079 (E.D. La. 2004) (allocating $102,000 of a $1.8 million settlement to class representatives as an incentive award and an award to other Plaintiffs to reflect participation in discovery, such as the giving of a deposition).

targets for retaliation. The Plaintiffs' counsel therefore recommend that these original nine (9) Plaintiffs receive an additional allocation of the settlement proceeds, with the largest of that additional allocation to be paid to Justin Crawford. As explained above, Sergeant Crawford was not only heavily involved in educating the attorneys, but agreed to place his name first on, and executed, the Verified Complaint, knowing that he would be identified by the LFUCG and the public as the face and name of the lawsuit. He has devoted numerous hours to the successful prosecution of this action.

2. <u>Other Active Plaintiffs</u>. In addition to the original nine (9) Plaintiffs, other Plaintiffs were particularly active in this litigation. Many of these individuals attended depositions, sometimes on multiple occasions and spanning multiple workdays. Many of these individuals substantially assisted the Plaintiffs' counsel in preparing for hearings, depositions, mediation, and trial. In many instances, these Plaintiffs missed work days (and therefore lost pay) as a result of this participation.

The Plaintiffs' counsel therefore propose the following allocations, totaling $36,300:

a.      An allocation of $1,000 each to the original nine (9) Plaintiffs. The total of these payments is $9,000.

b.      An allocation of $100 to each Plaintiff who gave a deposition in this case in order to partially compensate them for potential lost income from work and the time they devoted to prepare for an attend their depositions. The total of these payments is $4,300.

c.      An additional allocation of $2,500 to Rebecca Grillo, who regularly consulted and met with counsel, participated in settlement negotiations, and attended hearings;

d.      An additional allocation of $2,500 to Randy Jones, who regularly consulted and met with counsel, participated in settlement negotiations, and attended hearings;

17

e.  An additional allocation of $10,000 to Justin Crawford, who regularly consulted and met with counsel, participated in settlement negotiations, and attended hearings, and who was the lead Plaintiff in every sense;

f.  An allocation of $1,000 each to the eight (8) members of the negotiating team (for a total of $8,000), which met on several occasions with the attorneys to prepare for the mediation and then attended up to two days of the mediation.

**H.  Proposed Discount of Cash Payment to Non-Employed Plaintiffs**

While the "leave time" portion of the proposed settlement obviously has value, that time is not immediately (if ever) convertible into cash.  The Plaintiffs' counsel therefore propose (and the parties agreed at mediation) that the non-cash portion of the settlement be discounted in order to reflect the time-value of money and the deferral of use of the leave time.  The Plaintiffs propose that currently-employed Plaintiffs receive approximately 60% of the value of their allocation in cash, and 40% of the value of their allocation in leave time.  However, non-employed Plaintiffs should not, equitably, receive the entire value of their allocation in cash.  Therefore, the Plaintiffs' counsel recommend that the cash allocable to the Plaintiffs who are no longer employed at the DCC be discounted by 8%.

**I.  Plaintiffs Who Did Not Answer Interrogatories**

On November 1, 2007, the Court ordered that the LFUCG was entitled to receive "individualized discovery from the Plaintiffs in the form of signed interrogatory responses."  (D.E. 155).  Despite numerous attempts by the Plaintiffs' attorneys to contact each and every Plaintiff and urge them to complete their Interrogatories, responses were not received from approximately 29 Plaintiffs.  In light of the risk that the Court would have dismissed these Plaintiffs' claims for failure to comply with the Court's November 1, 2007, Order, and because Plaintiffs' counsel are unable,

in many instances, to ascertain the work experiences of and claims asserted by these individuals in the absence of signed interrogatory responses, the proposed allocation makes no distribution to these individuals.

## ATTORNEYS' FEES

**A.    The Fee Arrangement**

The original nine (9) Plaintiffs did not have the means, either individually or collectively, to pay attorneys' fees to MGM to represent their interests in this dispute.  The Plaintiffs asked MGM to agree to a contingency arrangement, with MGM advancing all costs.  MGM agreed, and each of the original nine (9) Plaintiffs executed an Employment Agreement.  A representative Employment Agreement, which was executed by Justin Crawford on August 31, 2006, is attached as Exhibit 7. The Employment Agreement states, in relevant part, as follows:

> 1.  Client agrees to pay to Attorneys:
>
>     (A) A sum equal to 33-1/3% of any and all amounts recovered by . . . settlement . . . if the Court certifies a class action; or
>
>     (B) A sum equal to 40% of any and all amounts recovered in the event the Court fails to certify a class action . . . .
>
> 2.  There shall be no credit given to Client for any funds received from the Fayette County Detention Center or related parties by Attorneys for their attorneys' fees as a result of a court order or settlement with it.
>
> 3.  Client shall be responsible for all court costs and costs of depositions, copies . . . which may be incurred, although Attorneys may advance said costs as a matter of convenience and shall be reimbursed by Client.  Said costs shall be deducted from the gross award to Client prior to distribution of said amounts.

(Exhibit 7).

Many of the subsequent Plaintiffs have executed similar Employment Agreements. The Notice of Collective Action and Consent to Sue Form ("Notice") approved by the Court, and sent to all parties who ultimately opted-in (Exhibit 3) states, in pertinent part:

### 5. **What Happens After I Join This Lawsuit?**

\* \* \* \*

The lawyer for the Plaintiffs is being paid on a contingency fee basis, which means that if there is no recovery, there will be no attorneys' fee. Under the fee arrangement, in the event there is a recovery, the Plaintiffs' lawyer will receive as a fee a percentage of any settlement obtained or money judgment entered in favor of the Plaintiffs, and /or by any attorneys' fees which the LFUCG may pay pursuant to any settlement or Court order. A copy of the fee agreement between the representative Plaintiffs and the Plaintiffs' lawyer may be obtained upon request from the Plaintiffs' lawyer, identified in Paragraph 4.

If you sign and return the Consent to Sue Form attached to this Notice, you are agreeing to designate the nine (9) representative Plaintiffs (listed in Paragraph 2) to make decisions on your behalf concerning the litigation, any settlement agreement reached with the LFUCG, any agreement with the Plaintiffs' attorney concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. These decisions and agreements made and entered by the representative Plaintiffs will be binding on you if you join this lawsuit by returning the attached Consent to Sue Form to the Plaintiffs' lawyer. However, the Court has jurisdiction to determine the reasonableness of any fee agreement with the Plaintiffs' lawyer, and the reasonableness of any settlement agreement which might be reached with the LFUCG.

(Exhibit 3).

The Consent to Sue Form ("Consent") approved by the Court and executed by each of the parties opting into this action is attached as Exhibit 8. It states in pertinent part:

I authorize the attorneys of Miller, Griffin & Marks, P.S.C., its successors and assigns, to represent me in this case. I understand that if my claim is successful, the fees of Miller, Griffin & Marks will be paid by a percentage of any settlement obtained or money

judgment entered in favor of the Plaintiffs, and/or by any attorneys' fees which the LFUCG may pay pursuant to any settlement or Court order. If my claim is not successful, I will not owe any fees to Miller, Griffin & Marks.

I designate the representative Plaintiffs as my representatives who shall, to the fullest extent possible, make decisions on my behalf concerning the case, the method and manner of conducting the case, the entering of an agreement with the Plaintiffs' lawyer regarding fees and costs, any settlement which may be reached with the LFUCG on my behalf, and all other matters pertaining to this lawsuit.

(Exhibit 8).

Simply stated, every Plaintiff[4] in this proceeding consented to a payment to MGM of all of its expenses incurred and one-third (1/3) of all sums awarded to the Plaintiffs, without any consideration of the fees paid by LFUCG.

**B.    The Risks Undertaken by the Plaintiffs' Counsel**

When it agreed to file the initial Complaint for the nine (9) Plaintiffs in this proceeding, MGM attorneys had no guarantee there would be any recovery of funds to reimburse it for its expenses incurred or the time devoted to this action by the professionals employed there. In fact, the Plaintiffs' attorneys understood that the only relief resulting from the filing of the proceeding might be policy changes, which would materially benefit the Plaintiffs but would prove neither monetary damages to the Plaintiffs nor funds to MGM. There was no guarantee that the Court would certify a class or a collective action, which would have meant that each of the individual Plaintiffs' claims would have to be tried separately. This risk, had it materialized, would have required MGM to devote a substantial amount of attorneys' time for modest recoveries. Additionally, in any

---

[4] The Tenth Amended Complaint identified all persons who opted in to this action as Plaintiffs, and the Court entered an Order dated May 28, 2008, permitting the filing of the Tenth Amended Complaint. (D.E. 311).

21

proceeding against a governmental entity, Plaintiffs and counsel face the risk that the defendant will

be found to be shielded by the doctrine of sovereign immunity or that the Plaintiffs' recovery will

otherwise be significantly limited.

**C.      Services Provided by Plaintiffs' Counsel**

Through September 11, 2008, the professionals at MGM have devoted a total of 6,968 hours

to this action.  MGM has paid fifty percent (50%) of the mediator's bill of $6,537.25.  The total of

all expenses incurred by MGM related to the representation of the Plaintiffs through September 11,

2008 is $56,092.  Attached hereto as collective Exhibit 9 is statement of the expenses billed to the

Plaintiffs.  Also attached as collective Exhibit 10 is a summary of the time spent, and billing rate,

for each professional who has provided services in this matter.  The identity of the professionals who

have worked in this matter and their effective billing rate are:

| | | |
|---|---|---|
| Thomas W. Miller, Attorney | - | $350 per hour |
| Thomas C. Marks, Attorney | - | $250 per hour |
| Carroll M. Redford, III, Attorney | - | $226.28 per hour |
| Don A. Pisacano, Attorney | - | $235.56 per hour |
| David T. Faughn, Attorney | - | $212.90 per hour |
| Elizabeth C. Woodford, Attorney | - | $175.05 per hour |
| Michelle L. Hurley, Attorney | - | $104.99 per hour |
| Michael J. Cox, Attorney | - | $216.49 per hour |
| Micah E. Salsman, Attorney | - | $ 85.67 per hour |
| Christy Hager, Paralegal | - | $ 79.95 per hour |
| Virginia Woods, Paralegal | - | $ 79.37 per hour |
| Brooks Roy, Paralegal | - | $ 80.00 per hour |
| Lillian Sanders, Paralegal | - | $ 73.70 per hour |
| Leanette Hounchell, Paralegal | - | $ 80.00 per hour |
| Lynette Mayo, Paralegal | - | $ 78.57 per hour |
| Mary Ron Moore, Paralegal | - | $ 75.00 per hour |
| Elliott C. Miller, Law Clerk | - | $ 50.00 per hour |

The total of fees billed by all MGM professionals is $1,082,117. The blended average rate per hour of all professionals is $155.30 per hour.[5] MGM's Summary of the hours worked in this action by each of the above-identified professionals, and the hourly rate of those professionals, is set forth on Exhibit 10.

The vast majority of the work by the Plaintiffs' counsel (6,602 out of 6,968 total hours) was conducted by a litigation team comprised of the following six (6) attorneys and one (1) paralegal:

- Thomas W. Miller, who was admitted to the bar in 1974, and has a current hourly rate of $400.

- Don A. Pisacano, who was admitted to the bar in 1990, and has a currently hourly rate of $250.

- Michael J. Cox, who was admitted to the bar in 1988, and has a currently hourly rate of $225.

- David T. Faughn, who was admitted to the bar in 1996, and has a current hourly rate of $225.

- Elizabeth C. Woodford, who was admitted to the bar in 1999, and has a current hourly rate of $200.

- Michelle L. Hurley, who was admitted to the bar in 2006, and has a current hourly rate of $120.

- Lynette Mayo, who has worked as a paralegal since 1994, and has a current hourly rate of $80.

---

[5] The reason for the odd billing rates is that the normal hourly billing rates for certain of the professionals has increased since September 6, 2006.

In all instances, the professional has been billed at his or her normal and customary hourly rate, with the exception of the Plaintiffs' lead counsel, Thomas W. Miller, who typically bills at a higher rate. The Plaintiffs' counsel believes that the hourly rates of all of the above-named MGM professionals are equal to, or less than, the hourly rates billed by legal professionals in Central Kentucky with comparable experience and ability.[6]

A brief summary of the services provided by MGM include:

1.    Devoting hundreds of hours to meetings with clients and potential witnesses to prepare for hearings, depositions, pleadings (including an original and ten (10) Amended Complaints), to address the clients' and witnesses' questions, and to prepare for mediation;

2.    Performing research in support of, and drafting, pleadings setting forth the Plaintiffs' various claims, including those for retaliation;

3.    Performing research in support of, and drafting, the motions and related briefs seeking injunctive relief to prohibit certain actions of DCC administrators. Several of these Motions resulted in hearings before the Court, which issued rulings favorable to the Plaintiffs;

4.    Performing research in support of, and drafting, motions and related documents seeking conditional and final certification of a collective action. These Motions were successful and likely had a significant impact on the LFUCG's willingness to mediate, and ultimately settle, this action;

---

[6] If desired by the Court, Plaintiffs' counsel will file additional support (such as Affidavits by other area attorneys) of their assertion that their hourly rates are well within the range of rates billed in this area by attorneys with comparable experience and ability.

5.    Attending numerous hearings before the Court, both in person and by telephone;

6.    Attending approximately 74 depositions, many of which were taken by counsel for LFUCG;

7.    Preparing for trial, including research for and drafting of Motions in Limine and jury instructions;

8.    Preparing for, and attending, the mediation which resulted in a settlement.

9.    Post-mediation conferences and calls with Plaintiffs, preparing allocations, explaining those allocations, and preparing for and attending post-mediation conferences before the Court.

**D.    Results Accomplished**

This case began with (9) individual Plaintiffs alleging that a governmental employer had not provided them with required lunch breaks and had required them to work time for which they were not paid.  As a result of the proposed settlement, the LFUCG will remit to the Plaintiffs $1,150,000 in cash and leave time.  The Plaintiffs will also enjoy materially improved work conditions.  For instance:

1.    Prior to the settlement, most Plaintiffs had a twenty-minute meal break and were required to walk to and from a break sheet, carry radios and respond to calls, run errands and respond to medical codes and facility emergencies during their meal breaks.  Under the terms of the proposed settlement, officers and commanders in Custody, Intake and Master Control Bureaus will now receive a 30-minute meal break, during which they will not be permitted to carry radios, and will not be permitted to perform any duties related to their employment (except in emergencies), allowing them to take an uninterrupted and reasonably relaxed meal break.  If the

25

officers and commanders are interrupted during their meals in order to respond to emergencies, they will be paid for that time;

2.     The Plaintiffs will be paid for all time they are on duty, whether during a purported break, before their shift is scheduled to begin, or after their shift is scheduled to end. Accurate timekeeping systems will be used rather than a hand-completed sheet;

3.     The LFUCG has represented (although not guaranteed) that additional rovers will be added to each shift so that there will be sufficient manpower to actually implement the changes that have been promised.

**E.     Plaintiffs' Counsel's Efforts to Litigate and Settle this Case Economically**

The day the Complaint was filed, Thomas W. Miller sent, by hand-delivery, a copy of the Complaint and the letter attached as Exhibit 11 to the LFUCG's Law Commissioner. In that letter, Miller offered to meet in an effort to resolve the conditions which led to the filing of this action. The letter did not lead to any such meeting - or even to a telephone call from LFUCG's counsel - concerning early resolution of this action. Indeed, the Plaintiffs did not receive <u>any</u> offer to settle this action until August 2008. The Mediation Agreement reached between the parties, however, eliminated the exact policies about which the original nine (9) Plaintiffs complained in the initial Complaint and the above-described letter, and adopted policies which are exactly those requested by the original Plaintiffs in September 2006. Had the LFUCG mediated and resolved this case at that early date, the Plaintiffs' and the LFUCG's attorneys fees would have been minimal, and the LFUCG would not have continued to violate the law for the past two (2) years, substantially minimizing the damages which it ultimately agreed to pay.

26

**F.    Mediation of Attorneys' Fees and Plaintiffs' Counsel's Contractual Right to Recover Attorneys' Fees**

At all times, including during the mediation, MGM refused to address its attorneys' fees unless and until all of the Plaintiffs' claims had been resolved to the satisfaction of the bargaining team and a majority of the lead Plaintiffs. During the middle of the second day of mediation, the parties had agreed upon the amounts payable to the Plaintiffs by the LFUCG. The parties had also agreed to the policy changes. The only issue that remained to be resolved was the issue of MGM attorneys' fees. At that point in the mediation, the LFUCG sought to negotiate the amount of those fees. MGM took the position that the question of attorneys' fees could be submitted to the Court, and agreed to accept attorneys' fees from the LFUCG in any amount ultimately awarded by this Court. The LFUCG took the position that, unless an agreement could be reached on the attorneys' fees, there would be no settlement of any sort. Not willing to jeopardize what MGM perceived to be a very favorable agreement benefitting the Plaintiffs, it agreed to accept from the LFUCG far less than the amount supported by the time that it has devoted to this proceeding.

By agreement with its clients, MGM is entitled to recover from the Plaintiffs all of its costs ($56,092), plus one-third (1/3) of the value of the settlement ($382,950), for a total of $439,042. MGM has voluntarily, and without being requested to do so by any of the Plaintiffs, reduced its fee request from the Plaintiffs to one-third (1/3) of the cash portion of the settlement, or $268,000 (rather than one-third of the total value of the settlement), plus the amount paid to the mediator, $6,537.25. The total attorneys' fees requested from the Plaintiffs' portion of the settlement is $274,537.25.

The total fees and costs requested from all parties is $1,144,537.25. After reducing that sum by the costs for which reimbursement is sought of $56,092, the total in requested fees is $1,088,445. In that the total number of hours invested by the MGM professionals to date is 6,602, that results in

27

a blended rate of $156 per hour to date.  This does not cover additional services that will be required in order to complete the settlement.

## G.    The Lodestar Method

An award of attorneys' fees in a collective action under the FLSA is to be determined by the "lodestar" method.  *Collins v. Sanderson Farms, Inc.*, 2008 WL 2811225 (E.D. La. 2008).  The lodestar method multiplies the number of hours reasonably expended by Plaintiffs' counsel by an appropriate hourly rate in the community for such work.  *Id.* at *11.  Although the Court may apply various equitable considerations to adjust the lodestar amount upward or downward,[7] "[t]here is a strong presumption . . . that the lodestar figure represents a 'reasonable' fee."  *Tlacoapa v. Carregal*, 386 F.Supp.2d 362, 373 (S.D.N.Y. 2005). Additionally, in FLSA cases, Courts caution against any "undue emphasis on the amount of the plaintiff's recovery" in determining the reasonableness of attorneys' fees, because the attorneys' fees award in an FLSA case "encourages the vindication of congressionally identified policies and rights."  *Grochowski v. Ajet Const. Corp.*, 2002 WL 465272, *2 (S.D.N.Y. 2002).  "Indeed, we have upheld substantial awards of attorney's fees even though a plaintiff recovered only nominal damages."  *Id.  See also Hopson v. Handsbrands, Inc.*, 2008 WL 3385452 (N.D. Cal. 2008).

---

[7] Those factors are:

(1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Geier v. Sundquist*, 372 F.3d 784, 792 (6th Cir. 2004).

In this case, the initial lodestar amount is $1,082,117 through September 11, 2008. Although the lodestar amount is somewhat less than the total amount of attorneys' fees sought in this action, Plaintiffs' counsel ask the Court to consider the following factors, all of which support the attorneys' fee award sought by Plaintiffs' counsel:

- To date, Plaintiffs' counsel has devoted a significant number of hours to post-settlement work. The Court has held one and scheduled at least two more hearings concerning the fairness of the settlement, and Plaintiffs' counsel anticipates that further work will be required in order to finalize the settlement.

- Plaintiffs' counsel seeks an award of attorneys' fees which is less than the total amount to which they are entitled under their contract with the Plaintiffs.

- This case required significant time and labor by Plaintiffs' counsel from the filing of the Complaint to date.

- This case presented several novel and complex questions. For example, the interpretation of the "first responder" regulation has not yet been addressed by the United States Court of Appeals for the Sixth Circuit or, to the best of Plaintiffs' counsel's knowledge, by any District Court within the Sixth Circuit. Due to the complexity of the law and the factual scenarios involved in this case, the memorandums in support of the motions for summary judgments (as well as the responses and replies) filed by all parties in this action routinely exceeded the page limitations imposed by the Local Rules.

- The Plaintiffs entered a contingency fee agreement with Plaintiffs' counsel, which, if expressly enforced pursuant to the contingency fee contract, would entitle Plaintiffs' counsel to recover attorneys' fees directly from the LFUCG ($870,000) as

well as one-third of the value of the settlement to be paid by the LFUCG to the

Plaintiffs ($382,950).

•       The results obtained by Plaintiffs' counsel far exceed the monetary damages to be

allocated to the Plaintiffs, but also include important policy changes which will

benefit all DCC Employees on a prospective basis.

CONCLUSION

For the reasons set forth above, the Plaintiffs respectfully request the Court's approval of the

above-proposed allocation of settlement proceeds and award of attorneys' fees.

Respectfully submitted,

MILLER, GRIFFIN & MARKS, P.S.C.
271 W. Short Street, Suite 600
Lexington, Kentucky 40507
Telephone: (859) 255-6676
Facsimile: (859) 259-1562


By:     /s/ Thomas W. Miller
        THOMAS W. MILLER
        ATTORNEYS FOR PLAINTIFFS

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been electronically filed through the ECF system this the 12th day of September, 2008, which will send a notice of electronic filing to all parties' counsel in the electronic filing system in this case.

George J. Miller
Brian C. Baugh
Latoi D. Mayo
Sharon L. Gold
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, Kentucky 40507-1746

Mitzi D. Wyrick
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street, Suite 2800
Louisville, Kentucky 40202-2898

/s/ Thomas W. Miller
COUNSEL FOR PLAINTIFFS

F:\Share\ew\Pldgs\Crawford\Pleadings\crawford-mt for attys fees.EW REVISED.wpd

31