**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

**CIVIL ACTION NO. 06-299-JBC**

**JUSTIN CRAWFORD, ET AL.,**                                                    **PLAINTIFFS,**

**V.**                              **MEMORANDUM OPINION AND ORDER**

**LEXINGTON-FAYETTE URBAN**
**COUNTY GOVERNMENT,**                                                    **DEFENDANT.**

**\* \* \* \* \* \* \* \* \* \***

This matter is before the court on the parties' joint motion for approval of the settlement agreement (DE 374) and the motion for attorneys' fees by all plaintiffs and for approval of the allocation of the settlement proceeds (DE 372).

A hearing on preliminary approval of these motions was held on September 30, 2008. The court granted preliminary approval of the settlement agreement, preliminary approval of the allocation of the settlement proceeds, and preliminary approval of the plaintiffs' counsel's request for attorneys' fees. DE 378.

A hearing on final approval was held on October 14, 2008. At the hearing, the court granted both motions. DE 390. The court issues this opinion in order to explain its ruling.

I.      **Background**

        A.      The Settlement Class and Allegations

The plaintiffs are current and former employees of the defendant, the

Lexington-Fayette Urban County Government ("LFUCG"), at LFUCG's Division of Community Corrections ("DCC"). The DCC is responsible for the operation of the Fayette County Detention Center and the Community Alternative Program.  In their complaint, the plaintiffs allege that "the DCC has engaged in long-standing, widespread, and multiple violations of the Fair Labor Standards Act . . . ("FLSA"), 29 U.S.C. § 201, et seq., and of the Kentucky Wages and Hours Act . . ., KRS Chapter 337."  This court, upon the defendant's motion, dismissed the state-law claims on January 10, 2007 (DE 85), and on January 26, 2007, this court conditionally certified the action as a collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). DE 97.

On May 28, 2008, this court conditionally certified three subclasses: "Subclass A" comprised of all plaintiffs who claim that the LFUCG has a policy or practice of denying the plaintiffs a bona fide meal break; "Subclass B" comprised of plaintiffs who hold or who have held the rank of Lieutenant and assert that they have improperly received "compensatory time" in lieu of overtime pay; and "Subclass C" comprised of plaintiffs who hold or who have held the rank of Captain and assert that they have improperly received "compensatory time" in lieu of overtime pay.  DE 311.  All other claims were held in abeyance pending resolution of the claims asserted by Subclasses A, B, and C.  Those claims held in abeyance consisted of claims for miscellaneous unpaid time.  Plaintiffs asserted that they deserved compensation for unpaid time spent transporting prisoners to the hospital

2

for medical care.  Plaintiffs also asserted that they had not been compensated for time spent on various pre- and post-shift duties.

B.     The Terms of the Settlement Agreement

The Settlement Agreement provides that LFUCG will pay the plaintiffs a total of $1,150,000.  DE 324, attachment 1, p. 4.   The payment includes all employer and employee obligations for pension and FICA contributions.  *Id.*  The sum of $1,150,000 will be allocated so that $805,000 will be in the form of cash payments made directly to the various plaintiffs, and $345,000 will be in the form of leave time.  *Id.*  In addition, the parties agreed that the defendant would pay plaintiffs' attorneys' fees of $870,000 and would not object to plaintiffs' counsel's request for any additional fees from the plaintiffs' settlement proceeds.[1]  *Id.*

The defendant also agreed to institute three policy changes: the Custody, Intake, and Master Control units, or "bureaus," will receive an unpaid thirty-minute meal period that will not be interrupted except for clearly defined emergencies; an employee who is "standing by" for more than six minutes waiting to be advised as to whether he or she will be needed for an additional shift will be compensated for that "stand by" time if he or she is not required to work;[2] and at the time a plaintiff

---

[1]Plaintiffs and plaintiffs' counsel had a contractual agreement that plaintiffs would pay their counsel one-third of any proceeds, regardless of any agreement made directly between defendant and plaintiffs' counsel.  See section on approval of attorneys' fees, *infra*, for more discussion of the attorneys' fees award.

[2]Current policy already requires compensation for "stand by" time when the employee is required to begin working.

leaves for hospital duty, he or she will be deemed on duty and eligible for pay and will receive an unpaid thirty-minute meal break while on hospital duty. *Id.* at 6.

In exchange, the plaintiffs agreed to release all claims alleged in their Tenth Amended Complaint and any unasserted claims under state, federal, or local law for earned but unpaid salary or wages, overtime pay, pension contributions, or compensatory time off, as well as any claims for missed or interrupted breaks or for retaliation for participation in the lawsuit. DE 374, attachment 2, ¶¶1.3, 2.1.

## II.   Approval of the Settlement

### A.   Applicable Law

This case is a collective action brought under Section 16(b) of the FLSA. As such, just as in a class action suit brought under Fed. R. Civ. P. 23, it cannot be settled without court approval. However, "[t]he Court's role in this situation is in many ways comparable to, but in others quite distinguishable from, that of a court in a settlement of a class action brought pursuant to Fed. R. Civ. P. 23, and derives from the special character of the substantive labor rights involved." *Collins v. Sanderson Farms, Inc.*, --- F.Supp.2d ---, 2008 WL 2811225, at *2 (E.D.La. July 9, 2008). The court must determine whether the settlement is a "fair and reasonable resolution of a bona fide dispute over FLSA provisions." *Collins*, at *3 (quoting *Lynn's Food Stores, Inc. v. U.S.*, 679 F.2d 1350, 1355 (11th Cir. 1982)).

Employees are guaranteed certain rights by the FLSA, and public policy requires that these rights not be compromised by settlement. The central purpose

4

of the FLSA is to protect covered employees against labor conditions "detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers."  29 U.S.C. § 202; *see Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728 (1981).  The FLSA guarantees employees fair compensation for time worked, including receiving compensation at a rate of one and one-half times the employee's regular rate for overtime work. *See* 29 U.S.C. § 207.   Because the FLSA creates a statutory entitlement, "employers and employees may not, in general, make agreements to pay and receive less pay than the statute provides for.  Such agreements are against public policy and unenforceable."  *Martin v. Indiana Michigan Power Co.*, 292 F.Supp.2d 947 (W.D. Mich. 2002) (quoting *Roman v. Maietta Contr., Inc.*, 147 F.3d 71, 76 (1st Cir. 1998)).

There are two exceptions to this prohibition: (1) settlement agreements may be supervised by the Department of Labor or (2) a federal district court may approve a settlement of a suit brought in a federal district court pursuant to Section 16(b) of the FLSA.  *See Lynn's Food Stores v. U.S.*, 679 F.2d 1350 (11th Cir. 1982).  The latter exception applies to the instant case.  "If no question exists that the plaintiffs are entitled under the statute to the compensation they seek . . ., then any settlement of such claims would allow the employer to negotiate around the statute's mandatory requirements."  *Collins*, at *4.  To verify that in settling a Section 16(b) collective action, plaintiff employees have not relinquished their rights

5

to compensation guaranteed by the statute, the court must determine whether such a question, or bona fide dispute, exists.

The need for the court to ensure that any settlement of a collective action treats the plaintiffs fairly is similar to the need for a court to determine that any class-action settlement is "fair, reasonable, and adequate."  As in class actions, in collective actions plaintiffs and plaintiffs' counsel have a potential conflict of interest in settling a case.  Also similar to class actions, the size of each plaintiff's claim may be small, limiting an individual plaintiff's motivation to contest the settlement.  Thus, as in class actions, judicial review of a collective action settlement must be exacting and thorough as "there is typically no client with the motivation, knowledge, and resources to protect its own interests, [and so] the judge must adopt the role of skeptical client . . . ." *Manual for Complex Litigation*, § 21.61, at 310 (4th ed. 2004).

The Sixth Circuit has identified seven factors that should aid a court in its determination of whether a class-action settlement is fair, reasonable, and adequate: (1) the risk of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.  *Int'l Union, United Auto., Aerospace, and Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (citing *Granada Invs.,*

6

*Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir.1992); *Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983)).  "The Court may choose to consider only those factors that are relevant to the settlement at hand and may weigh particular factors according to the demands of the case." *Redington v. Goodyear Tire & Rubber Co.*, 2008 WL 3981461, at *11 (N.D. Ohio August 22, 2008)(citing *Granada*, 962 F.2d at 1205-06).  The court will use these factors to guide its evaluation of whether the proposed settlement is fair and reasonable. *See Collins*, at *4.

B.    Analysis

i.    Bona Fide Dispute

The plaintiffs asserted the following claims: (1) whether captains and lieutenants are "non-exempt" employees under the FLSA and therefore entitled to overtime compensation; (2) claims for compensation for unpaid meal breaks during which the plaintiffs were required to work and for unpaid time spent performing pre- and post-shift duties; (3) claims for retaliation taken by defendant against plaintiff employees; and (4) liquidated damages.  This court finds that a bona fide dispute exists as to all claims.

First, there is a bona fide dispute as to whether plaintiff Captains, Lieutenants, and Major are exempt employees, as they are currently classified by the defendant employer.  The FLSA requires employers to pay their employees time-and-a-half for work in excess of forty hours per workweek. 29 U.S.C. §

7

207(a)(1). However, employers are not required to pay overtime to persons employed in a bona fide executive or administrative capacity. 29 U.S.C. § 213(a)(1).  While Congress has not defined the terms "executive" or "administrative," the Department of  Labor ("DOL") has promulgated extensive regulations that are used to determine whether an exemption applies. The exemptions to the FLSA's overtime provisions are to be "narrowly construed against the employers seeking to assert them," and the employer bears the burden to prove that an employee falls under the exemption. This court denied cross-motions for summary judgment on the issue of whether the plaintiffs who are DCC Lieutenants and Captains are exempt employees because there were genuine issues of material fact as to whether the Captains' and Lieutenants' job duties were primarily executive or administrative.  It is not certain how a jury ultimately would have resolved the issue.

Furthermore, the court found that a recently promulgated DOL regulation, the "first responder" regulation, was applicable to the dispute.  While the defendant believed it had a very strong case that the employees were properly classified, especially due to a prior case ruling that Lieutenants were properly classified, it recognized that the applicability of the "first responder" regulation had the potential to affect the officers' classifications.  Because of the lack of case law on the "first responder" regulation and the ambiguity of its language, the parties anticipated a fight over jury instructions as to how the jury was to apply the regulation.

8

Furthermore, the "first responder" regulation is new and some of the cases that consider it are currently on appeal, so there was the possibility that the controlling law could change during the course of the proceedings.

Adding yet another layer to the dispute, the parties disagreed on the impact of any finding that the officers were improperly classified as "exempt." The plaintiffs contended that if they prevailed, they would be owed compensation at a rate of "time and a half." The defendant maintained that the plaintiffs had already received compensation on a straight-time basis for overtime hours and so would be due compensation at only a "half time" rate for any overtime hours worked.

Second, there is a bona fide dispute as to whether the unpaid twenty-minute meal break resulted in liability for the defendant. The plaintiff argued that the policies adopted by the defendant were strong proof that the plaintiffs were made to work during their unpaid meal breaks. However, the plaintiffs may have been unsuccessful in this argument, because the jury may have applied the "predominant benefit" test to find that the break was used predominantly for the benefit of the employee. *See Myracle v. General Elec. Co.*, 33 F.3d 55 (6th Cir. 1994) (bona fide meal break where employees relieved of substantial duties during meal period and interruptions during breaks were infrequent); *Hill v. U.S.*, 751 F.2d 810 (6th Cir. 1984).

Furthermore, even if the plaintiffs were able to win on the issue of the predominant benefit of their time, the defendant planned to use several defenses

9

against liability.  First, the defendant planned to argue that the FLSA Section 7(k) defense applied, which would have established that the defendant was liable only for time worked beyond 43 hours per week, rather than 40 hours per week. Second, the defendant planned to present to the jury a *de minimis* defense, arguing that any interruption was in fact extremely minimal.  Third, the defendant planned to attempt to use an estoppel defense.  Many of the plaintiffs requesting compensation for unpaid time had failed to report the overtime on their time cards, and the defendant maintained that this failure estopped them from now requesting compensation.

Third, the plaintiffs also had a variety of retaliation claims against the defendant, as articulated in the plaintiffs' Tenth Amended Complaint.  DE 312. Only two of these retaliation claims involved easily measured economic damages due to an alleged failure by the defendant to promote two plaintiffs.  The others alleged harder-to-quantify emotional harm.  The defendant believed that the necessary causation element would be difficult for the plaintiffs to prove, but it also recognized that extensive litigation of the retaliation claims could be harmful for the defendant.  The possibility of negative publicity and lingering stigma, no matter the ultimate resolution of the claims, as well as the effect on employee morale and relations at the facility, were factors the defendant considered in agreeing to settle the claims.

Fourth, the parties have a bona fide dispute as to whether the plaintiffs

10

would be entitled to liquidated damages if they prevailed.  The parties agree that an award of liquidated damages would be within the judge's discretion and would hinge upon whether a jury found that the defendant had acted willfully and in bad faith.  The defendant believed it had a strong argument against liquidated damages, given the lack of any internal complaints and a previous lawsuit supporting its classification of Lieutenants as non-exempt.  Although defendant's largely admitted policies supported the plaintiffs' position, the plaintiffs conceded that they would have difficulty proving willful, bad-faith violations due to the inconsistencies about relevant policies in the depositions of the administrators of the detention facility.

ii.    Fair and Reasonable

The court finds that the settlement is fair and reasonable, using the factors as modified to apply to a collective action settlement.

**1.    The risk of fraud or collusion.**

The court finds that no fraud or collusion exists behind this settlement.  In the absence of evidence to the contrary, the court may presume that no fraud occurred and that there was no collusion between counsel. *Redington*, at *18 (citing *Int'l Union*, 497 F.3d at 628).  This case was filed in this court more than two years ago.  The parties filed cross-motions for summary judgment, both of which were denied by this court.  Both parties engaged in extensive discovery, and the defendant filed a motion to compel discovery. The parties thoroughly litigated

11

issues as they arose, including the first-responder regulation and the applicability of the Section 7(k) defense.  The defendant fought against certification of the classes and filed motions to decertify the classes.

The settlement is the product of arm's-length, good-faith settlement negotiations.  The parties engaged in two days of mediation, led by an experienced, neutral, third-party mediator, Hunter Hughes.  Mr. Hughes has mediated FLSA collective actions and litigated FLSA collective actions for both plaintiffs and defendants, and was able to point out to both parties potential weaknesses in their cases.  *See* DE 376, exhibit 2.

### 2.      The complexity, expense, and likely duration of the litigation.

The court concludes that this factor weighs heavily in favor of finding the settlement fair and reasonable.

This case was extremely complex, both factually and legally.  There are over 300 plaintiffs, each with fact-intensive claims that would have required specific factual findings by a jury during the liability phase.  The case presented many difficult legal questions making appeal following trial likely, regardless of which party prevailed at trial.  In particular, appeal as to the court's ruling on the first-responder regulation was extremely likely.  The applicability of the FLSA Section 7(k) defense, the court's certification of and refusal to decertify the collective action, the court's dismissal of the state-law claims, and anticipated evidentiary rulings at trial, such as on the admissibility of video recordings of the plaintiffs

12

while on the job, are additional issues identified by the parties as potential areas for appeal. Furthermore, the court's eventual decision as to liquidated damages was also likely to be appealed.

However, even before the parties began the lengthy appellate process, the case would have continued in district-court proceedings for a few more years. The case was scheduled for two trials, one on the issue of the exempt status of eleven of the plaintiffs, and the second on the issue of whether the plaintiffs were entitled to compensation for meal breaks. A damages trial – or several of them – may have been necessary.

The potential for a case of such long duration was of special concern to these parties, given the nature of the dispute. While the suit continued, no policy changes were likely to be instituted at the facility. Both parties were concerned about the effects of an atmosphere of acrimony at the workplace, where security needs are paramount.

In addition, by settling, the plaintiffs have avoided significant additional expenses. The plaintiffs have already invested $50,000 in expenses for depositions, transcripts, and subpoenas. Given the anticipated trial preparations and appellate process, these expenses were likely to increase.

### 3. The amount of discovery completed.

More than 200 interrogatories were completed in this case. More than eighty depositions were taken. The plaintiffs' counsel also sent two different

13

questionnaires to all plaintiffs in the case.  Through these tools, the plaintiffs and the defendant believe they were fully apprised as to all issues, both the "exempt status" and "meal break" issues, as well as those claims that had been held in abeyance.  Both parties considered themselves adequately informed as to all claims, potential claims, and potential liability.

**4.   The likelihood of plaintiffs' success on the merits.**

Given the factual and legal complexity of the case, it is difficult to gauge the likelihood of the plaintiffs' success at trial.  As acknowledged by both parties' attorneys, the claims essentially rested on the difficult-to-predict resolution of factual disputes by the jury.  Even if, for example, the plaintiffs were able to establish that they were owed compensation for working during meal breaks, the defendant still had in its arsenal the Section 7(k), estoppel, and *de minimis* defenses.  The complexity of the legal questions still remaining to be resolved compounded the uncertainty of the outcome at trial.

Because of the wide variety of claims and each individual's recovery on those claims depending on facts specific to that individual, it is nearly impossible to determine with certainty the exact figure of a maximum award to each individual. Notwithstanding the presence of over 300 plaintiffs, calculating even one plaintiff's maximum award is difficult.  Within any given week, a plaintiff might work in different bureaus and, depending on the day of the week, the activities that went on (and might have, for example, interrupted his meal break) would vary.  In sum,

14

estimating an amount of compensatory time for each individual and multiplying it by a wage rate would be a super-human task.

Because of this impossibility, the plaintiff offers instead a rough estimate of potential gross recovery for the plaintiff class, if the plaintiffs were to win on each and every issue at trial.  Plaintiffs' counsel estimates that the plaintiffs could at most recover $1.5 million for the meal break claim and approximately $200,000 for other claims.  Plaintiffs' counsel found recovery for the retaliation claims to be completely unpredictable. The defendant's estimate matched the plaintiffs' estimate, discounted for risk: anywhere from zero to $1 or $2 million, depending on whether and to what extent liquidated damages were awarded.  Compared to these figures, the plaintiffs' recovery under the settlement of $1,150,000 is almost 70% of the estimated maximum award.  Although the settlement is not all cash and includes leave time, this leave time has monetary value to the plaintiffs. Furthermore, the plaintiffs are receiving non-monetary relief in the form of important policy changes that could not have been achieved by a jury award of monetary damages.

**5.    The opinions of class counsel, class representatives.**
**6.    The reaction of absent class members.**

The parties join in requesting approval of the settlement.  This settlement was arrived at after two days of mediation, in which both counsel and eight representative plaintiffs and several representatives from defendant participated.

15

All nine of the named plaintiffs in the case have submitted to this court affidavits attesting to their approval of the settlement.  The court also has on file two affidavits of plaintiffs who are not named plaintiffs and who have claims that differ slightly from those of the named plaintiffs.  Those two plaintiffs also attest to their approval of the settlement.  *See* DE 376, exhibit 4.

Although there are no "absent class members," as there are in an opt-out class action, less-involved plaintiffs have had an opportunity to express any objections to the settlement.  This court held a fairness hearing on the settlement on October 14, 2008, at which plaintiffs opposing the settlement, allocation, or attorneys' fees were invited to voice their objections, either through live testimony, letters submitted to plaintiffs' counsel and filed with the court, or letters sent directly to the court.  No plaintiff appeared to make objections.  At the hearing, the parties responded to the objections that plaintiffs' counsel had received and previously filed.  *See* DE 387.  The court received two additional letters of objection on the day of the hearing, but after the hearing's conclusion, and requested and received the parties' responses to those objections.  *See* DE 390, 392, 393.  The court has considered all objections.

Only eleven plaintiffs, out of a total of 316, have made objections.[3]  Of these

---

[3]One letter was written by one plaintiff, Deborah Tolliver, but signed by five additional plaintiffs.  In the letter, the writer presents the details of the circumstances of both herself and her husband, who was also a plaintiff and one of the signers of the letter.  Although the letter presents the specifics of only the writer's and her husband's work histories with the facility, the objections made are of a general nature, and so to the extent it is relevant, the court does note that six

16

objections, the court will consider only those based on an accurate understanding of the facts and circumstances of the lawsuit and of the settlement.[4]  The objections primarily concern the plan for the allocation of proceeds, which the court has examined separately and in detail.  *See infra*, Part III.

One plaintiff, DeWain Cundiff, objected to counsel and also sent a letter directly to the court.  DE 391.  Both letters express the same objections.  Mr. Cundiff objects to the variations in awards among the plaintiffs, such that some with fewer years worked are receiving more compensation than those with a longer record of service, depending on the bureau in which the employee works.  That is, a plaintiff who has worked fewer years at the facility but was assigned to the Custody, Intake, or Master Control bureaus may receive more money than a plaintiff who has worked for the facility longer but was assigned to the Auxiliary Services bureau.  As discussed below, the court finds reasonable the distinctions

---

plaintiffs shared the objections made in the letter.

[4] Objections rooted in a misapprehension of facts were as follows.  DeWain Cundiff objects to recovery for plaintiffs with retaliation or exemption claims, as he did not believe these claims were a part of the lawsuit.  He is mistaken, and the inclusion of these claims in the settlement was appropriate.  John Vest objects because he did not personally approve the settlement, but presents no specific objections about either the settlement or the allocation.  Each plaintiff agreed when joining the action that the nine lead plaintiffs had his or her permission to make decisions related to the action, including the decision to agree to a settlement.  In Deborah Tolliver's letter, she notes her desire that the leave-time portion of her award be accounted for separately from the leave time she receives as a matter of course.  The plaintiffs and the defendant already have agreed that the leave time will be thus separated.

17

made by plaintiffs' counsel among the employees of the various bureaus.

Mr. Cundiff disagrees with plaintiffs' counsel's general method of allocating proceeds, as he believes that "everyone should get the same amount or not get anything." *See* DE 391.  The court finds the allocation plan arrived at by plaintiffs' counsel has been carefully crafted based on more sophisticated measures of equity and is therefore more appropriate than the plan suggested by the plaintiff.

One plaintiff who failed to fill out an interrogatory, Russell Bostick, objects that under the allocation plan he receives no compensation.  As discussed below, the court finds equitable the plaintiffs' decision to allocate no proceeds to those who declined to comply with this court's discovery order.

Another plaintiff, Deborah Tolliver, joined by five other plaintiffs, also objects only to the allocation of the settlement.  She objects to the treatment of those plaintiffs assigned to Auxiliary Services.  The court finds that the allocation adequately compensates those plaintiffs for their claims, and has considered below the details of the distinctions made among the bureaus and types of claims.

Winfred Coles filed a letter of objection to the attorneys' fee award and the allocation.  Specifically, Mr. Coles, a former employee, thinks that the allocation of only cash to former employees and cash and leave time to present employees is unfair.  The court disagrees, especially as it is unclear from the plaintiff's objections what use leave time would be to former employees like Mr. Coles.  Mr. Coles also makes an unspecified objection to the attorneys' fee request, vaguely alleging fraud

or collusion.  As discussed above, the courts finds no evidence of fraud or collusion, and the plaintiff makes no specific allegation that the court can examine in further detail.  In addition, as discussed in Part IV of this opinion, the court finds that the fees requested are reasonable.

In sum, the objections of these less-involved class members have been noted by the court, but the court finds none so substantial as to raise doubts about the fairness of the agreement.

### 7.     The public interest

If the settlement reflects a reasonable compromise over issues actually disputed, such as FLSA coverage or computation of back wages, a court may approve a settlement to "promote the policy of encouraging settlement of litigation."  *Lynn's Food Stores, Inc.*, 679 F.2d at 1353.  Settlement is the preferred means of resolving litigation.  *Collins*, at *4 (citing *Williams v. Nat'l Bank*, 216 U.S. 582 (1910)).

The court has considered all of these factors individually and collectively in assessing the proposed settlement agreement.  The balance of factors weighs in favor of approval of this settlement.  The court finds that it is a fair and reasonable settlement of a bona fide dispute.

### III.    Approval of the Allocation of Settlement Proceeds

The allocation plan distributes the settlement funds to the plaintiffs using

19

two basic criteria: the nature of their claims and the extent of their participation in the lawsuit.  The court finds that the allocation is fair and approves the allocation plan.

A.    Applicable Law

As a part of its exacting and thorough examination of a class-action settlement, a court must ensure that the distribution of the settlement proceeds is equitable.  *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (identifying fairness of distribution as "the second element of equity within a class" and noting that while pro-rata distribution "is unattainable in a settlement covering present claims not specifically proven and claims not even due to arise, if at all, until some future time, at the least such a settlement must seek equity by providing for procedures to resolve the difficult issues of treating . . . differently situated claimants with fairness as among themselves"); *see generally In re Global Crossing Securities and ERISA Litigation*, 225 F.R.D. 426 (S.D.N.Y. 2004); *In re Warfarin Sodium Antitrust Litigation*, 212 F.R.D. 231 (D.Del. 2002); *In re Lease Oil Antitrust Litigation III*, 186 F.R.D. 403 (S.D. Tex. 1999).  The need for equity in distributions of proceeds is no less in a collective-action settlement.  In its review of the proposed allocation, the court is guided by legal authority on the judicial review of distribution of class-action settlement proceeds.  The court considers the fairness and reasonableness of the allocation separately from the general settlement terms.  *See, e.g.*, *In re Wireless Facilities, Inc. Securities Litigation II*, ---- F.R.D. ----, 2008 WL 4146126

20

(S.D. Cal. 2008).

The law does not require pro-rata distribution and, as discussed in the previous section, in this case exact calculation of plaintiffs' claims was impossible. *See Int'l Union,* 497 F.3d at 628 ("Neither the Federal Rules of Civil Procedure nor the Supreme Court requires that settlements offer a pro rata distribution to class members; instead the settlement need only be 'fair, reasonable, and adequate.'") (citing *Ortiz*, 527 U.S. 815).

Larger awards to named plaintiffs and to those plaintiffs participating extensively in the litigation and discovery are common in class actions. *See Hopson v. Hanesbrands, Inc.*, 2008 WL 3385452 (N.D. Cal. 2008); *Quintanilla v. A&R Demolition*, 2007 WL 5166849 (S.D. Tex. 2007); *Camp v. The Progressive Corp.*, 2004 WL 2149079 (E.D. La. 2004); *In re Cardizem CD Antitrust Litigation*, 218 F.R.D. 508, 535 (E.D. Mich., 2003).  Such awards reflect the additional burdens of time, exposure, risk, and expense that these plaintiffs incurred during the course of the litigation.  *In re Cardizem*, 218 F.R.D. at 535.

B.    Analysis

i.    *Allocation based on nature of plaintiff's claim*

The allocation plan shows that the plaintiffs will receive compensation based on the character of their claims and the amount of time they have been employed by the defendant.

Those plaintiffs with exemption claims and retaliation claims will receive

21

lump-sum payments. The court finds such payments appropriate, given the difficulty of proving those claims

The plaintiffs' counsel have determined individual awards for the time-based claims (meal breaks, and pre- and post-shift claims) by first determining a per-year value for each type of claim based on the possibility of success on the merits at trial and the ease of establishing the damages in the liability phase.[5]  Then, each plaintiff with a particular type of claim will receive its assigned value for each year the plaintiff worked at the facility, with prorations for partial years worked. Because the meal-break claim was to be tried collectively and because plaintiffs' counsel consistently based that claim on the defendant's policies and practices, this method of establishing individual awards is appropriate.  This method also reflects the difficulty plaintiffs would have encountered in proving their pre- and post-shift duty claims.  Plaintiffs do not propose any compensation for miscellaneous unpaid time for those plaintiffs with rank of Lieutenant, Captain, or Major, as these

---

[5]Those plaintiffs in the Custody, Intake, and Master Control bureaus will receive $700 per full year worked at the bureau, with prorations for partial years worked.  Those plaintiffs working in Auxiliary Services, CAP, and Programs Bureaus will received $350 per full year.  Internal policies supported the allegations of those plaintiffs in the Custody, Intake, and Master Control Bureaus.  In contrast, the policies of the other bureaus did not provide support for the meal-break claims of those bureaus' employees.  However, due to conflicting information from those working in Auxiliary Services, CAP, and Programs, and because these employees often worked overtime shifts in the Custody bureau, those plaintiffs are being compensated.  Those plaintiffs whose interrogatory answers reflect some claim for miscellaneous unpaid time will receive $200 per year worked, with prorations for partial years.  These claims had been held in abeyance and were identified by the plaintiffs' counsel as being harder to prove than the meal-break claims.

22

plaintiffs typically reported all additional time worked and received "compensatory time" in return.

The plaintiffs propose that currently employed plaintiffs receive approximately 60% of the value of their allocation in cash and 40% of the value of their allocation in leave time.  Non-employed plaintiffs will receive their allocation in cash, discounted by 8% to reflect the time-value of money and the deferred use of the leave time by those currently employed.  These measures are taken in order to make the allocation as between current and former employees more equitable.

  ii. *Allocation based on extent of plaintiff's participation in the lawsuit.*

Second, the allocation plan shows that some plaintiffs will receive additional compensation for participation in the lawsuit.  The court notes two primary distinctions made among the plaintiffs that are related to their participation.  First, some plaintiffs are receiving compensation based on their participation, or in some cases extraordinary participation, in the lawsuit.  Second, those plaintiffs who failed to complete an interrogatory are receiving no compensation.  The court finds that additional compensation based on participation is justified.

The court approves compensation for giving depositions, being one of the nine lead plaintiffs, and extraordinary participation in the lawsuit.  In particular, the named plaintiffs' participation was extraordinary and significant, extending all the way back to the beginning of the litigation.  The lead plaintiff, Mr. Crawford,

extensively prepared before approaching counsel and presented counsel with a "package" of information that enabled counsel to understand the facts and analyze the merits of the case. Plaintiffs' counsel attributes its willingness to take on the case to this preparation and to the named plaintiff's obvious dedication and willingness to work with counsel. From the beginning, Mr. Crawford's name was identified with the lawsuit, and so his involvement was well-known to the defendant, his fellow employees, and the community. Two other plaintiffs, Rebecca Grillo and Randy Jones, also regularly consulted with counsel, participated in settlement negotiations, and attended hearings.

All nine lead plaintiffs spent considerable time and effort educating counsel as to the intricacies of the facility and the nature of their jobs, information the plaintiffs' counsel needed to litigate the case thoroughly and effectively. These plaintiffs were also publicly linked to the litigation and were potential targets for retaliation.

No compensation is allocated to the twenty-nine plaintiffs who did not complete interrogatories. Plaintiffs' counsel has represented to the court that it made extensive efforts to contact these people and encourage them to complete the interrogatories. The court therefore finds reasonable the plaintiffs' counsel's conclusion that these plaintiffs' failure to complete interrogatories was purposeful rather than inadvertent. By not completing their interrogatories, these plaintiffs were not in compliance with the court's discovery order. For this reason, these

24

plaintiffs could have been dismissed from the case with prejudice. Their dismissal from the case with prejudice would have been the functional equivalent of their remaining bound by the settlement but receiving no compensation. Furthermore, given the fact that plaintiffs' counsel used the answers in the interrogatories to determine awards, counsel had no way of estimating allocations for these plaintiffs. Distinctions made among plaintiffs based on their participation in discovery are justified.

For all the reasons stated above, the proposed allocation of the settlement proceeds is fair and reasonable.


IV.    **Approval of Attorneys' Fees**

A.    Applicable Law

An attorneys' fee award must be reasonable. *See Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999) (citing *Blum v. Stenson*, 465 U.S. 886, 893 (1984)). "A reasonable fee is one that is 'adequate to attract competent counsel but . . . [does] not produce windfalls to attorneys.'" *Id.* (quoting *Blum*, 465 U.S. at 897). When plaintiffs entered into a contingent fee agreement with counsel, the reasonableness of the resulting fee "should always be subject to the supervision of the court." *Green v. Neves*, 111 F.3d 1295, 1302 (6th Cir. 1997)(quoting *Krause v. Rhodes*, 640 F.2d 214, 219 (6th Cir. 1981). "The starting point for determining a reasonable fee is the lodestar, which is the product of the number of hours billed and a reasonable hourly rate." *Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 616

25

(6th Cir. 2007) (citing *Hensley v. Eckerhard*, 461 U.S. 424, 434 (1983)).

After determining the lodestar amount, a court may adjust that amount

based on twelve factors:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Paschal v. Flagstar Bank*, 297 F.3d 431 (6th Cir. 2002)(quoting *Blanchard v.

Bergeron*, 489 U.S. 87, 91n.5 (1989)); *see also Reed*, 179 F.3d at 471-72.

Although the court may apply various equitable considerations to adjust the

lodestar amount, "[t]here is a strong presumption . . . that the lodestar figure

represents a 'reasonable fee.'" *Tlacoapa v. Carregal*, 386 F.Supp.2d 362, 373

(S.D.N.Y. 2005).  "To justify an award of attorneys' fees, the party seeking

compensation bears the burden of documenting its work."  *Gonter*, 510 F.3d at

617 (citations omitted).

### B.     Analysis

Plaintiffs' counsel is requesting a total attorneys' fee award of

$1,144,537.25.  Per the terms of the settlement agreement, defendant agreed to

pay plaintiffs' counsel attorneys' fees of an amount not to exceed $870,000.

Plaintiffs' counsel proposes that the additional $274,537.25 be paid from the cash

26

portion of the plaintiffs' settlement proceeds, comprised of these two components: one-half of the mediator's fee ($6,537.25) plus one-third of the cash portion of the settlement amount ($268,000). The court finds that the requested amount is reasonable.

Plaintiffs' counsel have made several concessions to reach this requested amount. Although the requested amount is slightly greater than the lodestar amount plus costs, plaintiffs' counsel has claimed fewer hours than the total worked as well as a slightly lower hourly rate. Plaintiffs' counsel calculated a lodestar amount of $1,082,117, claiming 6,968 total hours devoted to the case by the law firm at a blended average rate per hour of all professionals of $155.30. Plaintiffs' counsel is requesting fees only for hours worked prior to September 11, 2008, the date on which it filed with this court the motions related to the potential settlement. Since September 11, 2008, counsel has prepared for and attended two additional hearings in this court and has made numerous additional filings as requested by the court. Counsel is not requesting any compensation for this time. Plaintiffs' lead counsel has billed his time at an hourly rate less than his usual hourly rate. His usual hourly rate is $400, but his requested amount is $350 per hour. If the full costs of the action – $56,092 – were added to this lodestar amount, the total fee request would be $1,138,209, an amount which is only about $6,000 less than the requested amount of $1,144,537.25. The concessions made by the plaintiffs' attorneys easily exceed $6,000.

27

.

Furthermore, the amount requested from plaintiffs' settlement proceeds is less than the amount the plaintiffs' counsel could receive if they fully enforced their fee agreement.  The plaintiffs and plaintiffs' counsel had agreed that the attorneys would take on the case on a contingency basis.  DE 372, exhibit 7.  The clients agreed to pay their attorneys one-third of any settlement proceeds, and the clients would be given no credit for any funds received directly from the defendant per court order or a settlement agreement.  *Id.*  Counsel also agreed to pay any expenses up-front but to reimburse itself for any expenses from the gross award prior to any distribution.  *Id.*  According to the agreement, then, plaintiffs' counsel is entitled to recover all of its costs ($56,092), plus one-third of the value of the settlement ($382,950), plus the entire amount paid by the defendant ($870,000), for a total of $1,309,042, an amount which significantly exceeds the requested amount of $1,144,537.25.

The court finds that the plaintiffs' counsel have provided sufficient documentation of their lodestar hours.  *See* DE 372, exhibit 10; DE 382.  The hourly rates are reasonable for the regional area, as attested to by two area attorneys.  *See* Affidavit of Maurita G. Kamer, DE 383, exhibit 1; Affidavit of William M. Lear, Jr., DE 383, exhibit 2.  Furthermore,  the amount of time plaintiffs' counsel devoted to the case was reasonable, given the complexity of the factual and legal issues it presented.  *See* Affidavit of Robert F. Houlihan, Jr., DE

28

383, exhibit 3, ¶6.

In addition, the court finds that no downward adjustment from the requested amount is appropriate. Including the unclaimed hours, attorneys spent more than 7,000 hours over the course of two years on this case.  This amount of time represented a significant investment of time and resources by the attorneys and their law firm, with a high risk of no financial return.  There was no guarantee that the court would certify a class or collective action, the absence of which would have required plaintiffs' counsel to proceed with each claim individually. Furthermore, plaintiffs' counsel recognized that the only relief resulting from the proceeding might be policy changes, thus yielding no monetary award from which a contingent fee could result.  The case presented several novel and difficult issues requiring considerable legal skill, such as the "first responder" regulation and the certification of the class.  The results obtained by plaintiffs' counsel include not just monetary damages but also policy changes that will benefit all DCC employees.

For these reasons, the court finds that a total attorneys' fee of $1,144,537.25 is appropriate.


**V.**    **Conclusion**

Accordingly,

**IT IS ORDERED:**

(1)    The joint motion for approval of settlement agreement (DE 374) is **GRANTED**.

29

(2)     The motion for attorneys' fees by all plaintiffs and for approval of allocation of proceeds of settlement (DE 372) is **GRANTED**.

**IT IS FURTHER ORDERED**:

(1)     The attorneys' fees will be paid as proposed by the plaintiffs' counsel's motion: $870,000 from defendant; $274,537.25 from cash available for distribution to plaintiffs, to be deducted from the July 2009 payment to plaintiffs.

(2)     Motions in limine as to evidence to be presented at trial are **DENIED as moot** (DE 357, 358, 359, 360 363).

Signed on  October 23, 2008

JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY